UNITED STATES of America, Plaintiff–Appellee,

v.

Charles E. PORTER, Defendant–Appellant.

No. 97–1751.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 8, 1997.

Decided May 14, 1998.

Timothy M. Morrison (argued), Judith A. Stewart, Office of the United States Attorney, Indianapolis, IN, for Plaintiff–Appellee.

John R. Maley, Joseph C. Chapelle (argued), Barnes & Thornburg, Indianapolis, IN, for Defendant–Appellant.

Before KANNE, ROVNER, and EVANS, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

Charles Porter pled guilty to five counts of mail fraud and one count of wire fraud, and now challenges the sentence he received under the Sentencing Guidelines. He contends that the district court erred in calculating the amount of loss under U.S.S.G. § 2F1.1, in adding a two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1, and in departing upward two levels on the ground that Porter utilized a minor to further his criminal activity. Finding no error on any of these points, we affirm Porter's sentence.

## I.

Between June 1993 and September 1995, Porter was employed as a licensed stockbroker with Cities Securities Corporation ("CSC") in Indianapolis, where he provided investment services and advice to CSC customers. With respect to some of those customers, however, Porter chose to line his own pockets rather than to provide the investment services he was paid to perform. For example, Porter at times took money a customer had transferred to CSC for investment and used the money himself, failing even to open a CSC account for the customer. To keep the customer off his trail, moreover, Porter mailed false account statements on CSC letterhead advising the customer of the status of his non-existent account. On other occasions, Porter liquidated existing customer accounts without authorization, depositing checks made payable to the customer into an account Porter himself controlled.

The presentence report ("PSR") estimated the loss attributable to Porter's conduct at just over $500,000, meaning that an additional 10 levels would be added to Porter's base offense level under U.S.S.G. § 2F1.1(b)(1)(K).[1] At the sentencing hearing before the district court, the parties debated the extent of the loss to Dwight Jackson, a CSC customer who had invested money through Porter. The parties ultimately agreed that if Jackson's loss exceeded $51,-586.61, then the total loss attributable to Porter's conduct would exceed $500,000, making the PSR's recommended 10–level enhancement under section 2F1.1(b)(1)(K) appropriate. Yet if the loss to Jackson was less than that amount, 9 rather than 10 levels would be added. The district court found by a preponderance of the evidence that the loss to Jackson exceeded $51,586.61. The court noted that Jackson's original investment was only $50,000, but that the evidence established that the investment "would have appreciated if properly invested" such that the value of Jackson's account would have exceeded $52,000. (R. 48, at 91.) The court noted, in fact, that Porter had provided statements to Jackson indicating that the value of the account had grown to over $64,000 by July 15, 1993. In the end, the court found that the amount of Jackson's loss was quite close to what CSC had been required to pay

---

1. Although Porter was sentenced on March 17, 1997, the district court applied the 1994 version of the Sentencing Guidelines to alleviate any ex post facto concerns. Neither party disputes that decision here, and we shall therefore apply that version of the Guidelines as well.

to settle a claim Jackson had made against it on account of Porter's fraud—$78,687.47. (R. 48, at 91–92.)

 In challenging the district court's loss determination, Porter contends that the loss incurred by Jackson should be limited to his original $50,000 investment, and that even if potential appreciation to the investment may properly be considered, there was insufficient evidence to establish such appreciation here. Our review of the district court's ultimate loss determination is for clear error, but our assessment of the meaning of the term "loss" under section 2F1.1(b)(1) is plenary. *United States v. Morris*, 80 F.3d 1151, 1171 (7th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 181, 136 L.Ed.2d 120 (1996); *United States v. Holiusa*, 13 F.3d 1043, 1045 (7th Cir.1994).

 We consider first whether it is ever appropriate to account for appreciation or earnings on an investment in calculating loss under section 2F1.1(b)(1), or whether the loss under that guideline is limited to the original investment amount. The commentary to section 2F1.1 tells us that the term "loss" refers to "the value of the money, property, or services unlawfully taken; it does not, for example, include interest the victim could have earned on such funds had the offense not occurred." U.S.S.G. § 2F1.1, comment. (n.7). In *United States v. Allender*, 62 F.3d 909, 917 (7th Cir.1995), *cert. denied*, 516 U.S. 1076, 116 S.Ct. 781, 133 L.Ed.2d 732 (1996), we interpreted the commentary's reference to "interest" as referring "to speculative 'opportunity cost' interest—the time value of money stolen from the victims," and not to "a guaranteed, specific rate of return that a defendant contracts or promises to pay." We therefore concluded in *Allender* that "the value of the thing taken" includes both the principal of a fraudulently-procured loan as well as agreed-upon interest. *Id.* That holding is in line with the interpretations accorded to section 2F1.1 and its commentary by a number of our sister circuits. *E.g.*, *United States v. Nolan*, 136 F.3d 265, 273 (2d Cir. 1998) (amount taken under section 2F1.1 includes both principal and unpaid interest and penalties on a note); *United States v. Goodchild*, 25 F.3d 55, 66 (1st Cir.1994) (finance charges and late fees due as a result of

fraudulent use of credit cards included as loss under section 2F1.1); *United States v. Henderson*, 19 F.3d 917, 928 (5th Cir.) (interest on fraudulently procured loan can be included as part of loss if there is a reasonable expectation of receiving that interest), *cert. denied*, 513 U.S. 877, 115 S.Ct. 207, 130 L.Ed.2d 137 (1994).

Porter and the government construe *Allender* as supporting the position each takes here. Porter contends that because no specific rate of return was guaranteed on Jackson's original $50,000 investment, any appreciation was speculative at the time the investment was made. Porter therefore likens whatever appreciation resulted to the "speculative 'opportunity cost' interest" that *Allender* suggests should be excluded from the loss calculation. The government rejoins, however, that Jackson received written assurances from Porter that the account would generate an 8% annual return, in addition to written statements indicating that the account in fact was growing. The government points to those documents in suggesting that Jackson had a reasonable expectation that his account was worth more than the $50,000 he originally invested.

Although we agree with the parties that *Allender* establishes the framework for our analysis here, the facts of that case are sufficiently distinct that it is not controlling. The facts in Porter's case actually are closer to those considered by the Tenth Circuit in *United States v. Lowder*, 5 F.3d 467 (10th Cir.1993). There, the defendant had solicited investments from a number of unsophisticated clients, guaranteeing them a 12% return. Lowder never invested the clients' funds, however, but used the money for personal purposes. To disguise his fraud, Lowder sent fraudulent account summaries which represented that interest was accruing at the guaranteed rate. *Id.* at 470–71. In sentencing Lowder under the Guidelines, the district court included both the investment principal and the guaranteed 12% return as part of the loss, and the Tenth Circuit affirmed. Like this court in *Allender*, the Tenth Circuit interpreted the commentary to section 2F1.1 "as disallowing [only] 'opportunity cost' interest, or the time-value of money stolen from

victims," and not guaranteed return rates like that promised by Lowder to his defrauded clients:

> ... Defendant defrauded his victims by promising them a guaranteed interest rate of 12%. He induced their investment by essentially contracting for a specific rate of return. He also sent out account summaries, showing the interest accrued on their investment. This is analogous to a promise to pay on a bank loan or promissory note, in which case interest may be included in the loss.

*Id.* at 471. We agree with the Tenth Circuit's conclusion in *Lowder*, and on the basis of that decision and our own decision in *Allender*, we reject the assertion that an investor's loss must in all circumstances be limited to the original investment amount.

■ Porter nonetheless argues that even if the commentary to section 2F1.1 does not serve to limit loss to the original investment amount in all cases, the evidence here is insufficient to support a loss to Jackson in excess of that amount. Although the government nowhere suggests that Porter initially guaranteed Jackson a specific rate of return, it does emphasize that Porter later made a series of written representations indicating that the value of Jackson's account was growing. On November 19, 1992, for example, approximately six months after Jackson transferred the $50,000 to CSC, Porter represented in writing that the value of Jackson's account had grown to $55,000. Jackson subsequently was apprised that the value of his account was $64,300 on April 17, 1993, $64,103.50 on July 15, 1993, and approximately 64,000 in March 1994. On the latter two documents, moreover, Porter represented that Jackson would receive an annual return on his investment of approximately 8%.

In light of that evidence, we do not think the district court clearly erred in concluding that Jackson's loss was at least $51,586.61. Even if Porter did not initially guarantee Jackson any specified rate of return, he represented that Jackson in fact had earned a fairly healthy return (over $14,000) in the first year of the investment alone. Porter also at that point represented that Jackson could expect a return of approximately 8% in the future. We can only assume that Porter made those representations in order to disguise his fraud a while longer. Yet once Porter represented that the value of Jackson's account was $64,000 when the account actually had already been liquidated, the "thing taken" from Jackson for purposes of section 2F1.1(b)(1) was at least the represented value, for if Jackson had at that point chosen to liquidate the account himself, he would have expected to receive that amount. This is therefore not a case of "speculative opportunity cost interest," as Porter asserts, because it does not involve merely the time value of Jackson's money had the fraud not occurred. Rather, this case concerns accrued interest or appreciation that the investor was told he had earned. Thus, Jackson would reasonably expect to receive that interest as well as his entire principal upon liquidating the account. *See Lowder,* 5 F.3d at 467; *see also Allender,* 62 F.3d at 917; *Henderson,* 19 F.3d at 928–29. For these reasons, the district court did not clearly err in concluding that the amount of loss attributable to Porter's fraud exceeded $500,000.

## II.

■ We next consider whether the district court was correct in applying a two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1 based on Porter's flight from the jurisdiction. Porter first learned that he was the subject of a criminal investigation on November 4, 1995, when he was interviewed by Special Agent Gary Dunn of the FBI. Porter apparently admitted to Dunn that he had used client funds without authorization and then asked Dunn what was likely to happen to him. Dunn told Porter that his case would be referred to the United States Attorney for possible prosecution and that Porter could go to jail.

Before the end of 1995, the Assistant United States Attorney ("AUSA") assigned to Porter's case was notified that attorney James Voyles would be representing Porter in the matter. By letter of January 24, 1996, Voyles inquired of the AUSA whether the FBI planned to arrest Porter on February 1, as Porter apparently had heard. Voyles requested that if an arrest was imminent, "I

would appreciate it if you would let us know, so we may surrender him." (GX 23.) The AUSA informed Voyles in a February 19 letter that Porter's case was scheduled for presentation to the grand jury on March 19, but that the government was prepared to negotiate a plea agreement prior to the presentation date if Porter was "interested in waiving indictment and entering pleas to multiple felony counts." (GX 24.) The AUSA also indicated that he "continue[d] to receive information that [Porter] is planning to leave the area. Therefore, it is important to put him under the court's release conditions as quickly as possible." (*Id.*) Voyles replied to that letter on February 27, telling the AUSA that he had forwarded the February 19 letter to his client and that he hoped to meet with Porter shortly in order to provide "some direction about the March 19 date." (GX 25.)

The AUSA's information about Porter's plans proved to be accurate. On February 19, 1996, Porter sold his Oldsmobile Cierra to a dealer in Bloomington, Indiana, telling the dealer that he soon would be leaving for Germany and that he also would be selling his van in a week to ten days. The following day, however, Porter returned to the dealership and sold a white van, informing the dealer that he was departing sooner than expected. Porter apparently left the jurisdiction shortly thereafter.

By letter of March 19, 1996, the AUSA informed Voyles that the grand jury would return an indictment against Porter the following day and that a preliminary hearing had been scheduled for 2:30 that afternoon before a federal magistrate. The indictment was returned on schedule, but prior to the 2:30 p.m. hearing, Voyles informed the AUSA that he had been unable to locate his client. A warrant issued for Porter's arrest, and Special Agent Dunn then began to investigate Porter's whereabouts, conducting interviews and examining telephone records.

Porter eventually was arrested on May 11, 1996 in Meigs County, Tennessee after passing two bad checks to the woman from whom he had rented a mobile home. Porter had used the name Bernard Wayne Wilson in renting the mobile home, but after the May 11 arrest, Porter's landlord found mail addressed to Porter and his wife while inspecting the premises. This discovery prompted the landlord to contact the local Sheriff's Department. At the time of his arrest, Porter had with him a Tennessee driver's license bearing his picture but the name Bernard Wayne Wilson. The authorities also found in the mobile home a social security card and a Lawrence County, Indiana birth certificate for Bernard Wayne Wilson, two embossed sealers, one for an Indiana notary public and the other for the Lawrence County Health Department, and a book entitled "How to Create a New Identity." Special Agent Dunn also later indicated that Porter had altered his hair coloring since their initial interview.

As he was being transported to an appearance before a federal magistrate in Tennessee, Porter told the FBI agent accompanying him of his initial interview in Indiana with Special Agent Dunn. Porter explained that he had been attempting, through his attorney, to work out a plea agreement with the government relating to the charges in that case, but because he probably would be required to serve a long jail sentence, he had decided to leave Indianapolis and to change his identity. Porter told the agent that he had made this decision because he felt that he could not serve the jail time.

■ The district court found that Porter's flight from Indianapolis qualified as a willful obstruction of justice under section 3C1.1 of the Guidelines. Porter disagrees, arguing that he was merely "avoiding or fleeing from arrest" when he traveled to Tennessee under an assumed name. As support for that argument, Porter points to the commentary to section 3C1.1, which indicates that such flight from arrest generally will not give rise to an enhancement for obstruction of justice. See U.S.S.G. § 3C1.1, comment. (n.4(d)). We review the district court's obstruction finding for clear error, giving due deference to the lower court's application of the Guidelines to the facts. *United States v. Draves*, 103 F.3d 1328, 1337 (7th Cir.), *cert. denied*, — U.S. ——, 117 S.Ct. 2528, 138 L.Ed.2d 1028 (1997); *see also* 18 U.S.C. § 3742(e).

Application Note 4 to section 3C1.1 includes a "non-exhaustive list" of the types of conduct that generally will not warrant an enhancement for obstruction of justice but that can be considered and appropriately sanctioned through the assignment of a particular sentence within the guideline range. *See United States v. Monem*, 104 F.3d 905, 909 (7th Cir.1997) (emphasizing that list is "nonexhaustive"). The last example in that list is "avoiding or fleeing from arrest." U.S.S.G. § 3C1.1, comment. (n.4(d)). Porter argues that he merely fled from an imminent arrest when he sold two vehicles and moved to Tennessee, effectively adopting a new identity to avoid prosecution on the mail and wire fraud charges. In response, the government contends that the application note refers only to instinctive flight, which in its view is not an apt description of Porter's conduct in this case. The government asserts, rather, that Porter acted deliberately and willfully in taking steps to leave the jurisdiction and to conceal his true identity. The government emphasizes, and Porter concedes in fact, that he took these steps knowing that his attorney was engaged in plea negotiations with the government. The government therefore likens Porter's conduct to "escaping or attempting to escape from custody before trial or sentencing," which Application Note 3(e) indicates will generally give rise to an enhancement for obstruction. *See* U.S.S.G. § 3C1.1, comment. (n.3(e)).

Our recent decision in *Draves* aids our consideration of these arguments, as we there analyzed the same two application notes that are at issue here. In *Draves*, officers arrived at the defendant's home to execute arrest warrants directed to Draves and an accomplice. The officers encountered Draves first and therefore arrested him, applying handcuffs and placing him in the back seat of a squad car before turning their attention to the accomplice. Once they did so, however, Draves seized the opportunity and fled on foot, but he was apprehended a mere three houses away. 103 F.3d at 1336–37. The district judge found that Draves' flight did not warrant an enhancement for obstruction of justice, and we agreed. Explaining that the ultimate question under section 3C1.1 is "whether the defendant's con-

duct evidences a willful intent to obstruct justice," we observed that in answering that question, the cases tend to draw a distinction between "panicked, instinctive flight" and "calculated evasion." *Id.* at 1337 & 1338 (citing *United States v. Hagan*, 913 F.2d 1278, 1285 (7th Cir.1990), and *United States v. Mondello*, 927 F.2d 1463, 1466–67 (9th Cir.1991)). Our *Draves* decision embraced that distinction, holding that "when a defendant runs from arresting officers, ... the proper yardstick for a § 3C1.1 enhancement is whether defendant's departure from the scene of arrest was spontaneous or calculated." *Id.* at 1338. We agreed with the lower court that Draves' case was one of spontaneous flight that fell short of a willful attempt to obstruct justice. *Id.* at 1337. In doing so, we rejected the government's contention that because Draves had fled after a custodial arrest, Application Note 3(e) required application of the enhancement. *Id.* We labeled the government's argument "overly formalistic" and rejected it in favor of "a less myopic analysis ... that considers all of the relevant Application Notes together with the language and purpose of the Guideline." *Id.* at 1337–38. Such an approach is appropriate, we found, even after *Stinson v. United States*, 508 U.S. 36, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993), for three reasons: Application Notes 3 and 4 potentially overlap, the examples they provide are "non-exhaustive," and those examples are merely intended to " 'assist the court in determining whether application of this enhancement is warranted in a particular case.' " *Draves*, 103 F.3d at 1338 (quoting U.S.S.G. § 3C1.1, comment. (n.2)). In the end, then, we affirmed the district court's refusal to apply the enhancement because Draves' flight was properly characterized as spontaneous and instinctive, even if technically occurring after a custodial arrest.

*Draves* clearly supports the district court's application of the obstruction enhancement here. Although Porter had not yet been arrested at the time of his flight, he had been interviewed by Special Agent Dunn and had admitted to using client funds without authorization. Porter knew, in fact, that an indictment directed to that conduct was imminent and that his attorney was engaged in prelimi-

nary discussions with the government about a possible plea agreement and a voluntary surrender. It was in that setting that Porter affirmatively decided to leave the jurisdiction and to change his identity. In executing that plan, Porter sold two vehicles to a local automobile dealership, changed the color of his hair, moved his family to Tennessee, rented a mobile home under a fictitious name, and created a fabricated driver's license, social security card, and birth certificate. And he apparently accomplished all of this with the aid of a helpful book entitled "How to Create a New Identity." As the district court found, this clearly was not the spontaneous flight from arrest to which Application Note 4(d) refers; rather, it was a calculated and deliberate plan to evade the authorities where an indictment was imminent. In the circumstances of this case, we agree that Porter's conduct qualifies as a willful obstruction or attempt to obstruct justice under section 3C1.1 despite the fact that Porter was not yet under arrest or in custody at the time of his flight. *See United States v. Walcott*, 61 F.3d 635, 639 (8th Cir.1995) (defendant's conduct cannot be characterized as "merely avoiding or fleeing from arrest" where he evaded the authorities for seventeen months by changing his residence and physical appearance, and by using an alias), *cert. denied*, 516 U.S. 1132, 116 S.Ct. 953, 133 L.Ed.2d 877 (1996); *Mondello*, 927 F.2d at 1466–67 (defendant's conduct not mere flight where for two weeks prior to his final arrest, defendant "played a cat-and-mouse game of avoiding the authorities, though he knew he was expected to surrender himself voluntarily"); *but see United States v. Stites*, 56 F.3d 1020, 1026 (9th Cir.1995) (distinguishing *Mondello* and finding no obstruction where defendant fled the jurisdiction while he was under investigation and used aliases while in hiding), *cert. denied*, 516 U.S. 1138, 116 S.Ct. 967, 133 L.Ed.2d 888 (1996); *United States v. Alpert*, 28 F.3d 1104, 1107 (11th Cir.1994) (en banc) (defendants' disappearance during plea negotiations and use of aliases after flight does not support enhancement for obstruction).

Porter also argues that the record here will not support an obstruction enhancement because there is nothing to indicate that Porter's flight from the jurisdiction hindered the government's investigation or Porter's subsequent prosecution. The easy response is that such a hindrance—or actual prejudice, in the government's words—is not required, because section 3C1.1 applies to those defendants who attempt to obstruct or to impede the administration of justice, as well as to those who actually succeed in doing so. *See United States v. Nobles*, 69 F.3d 172, 192 (7th Cir.1995); *United States v. Stevenson*, 6 F.3d 1262, 1269 (7th Cir.1993); *see also United States v. Draper*, 996 F.2d 982, 986 (9th Cir.1993). Yet the district court also found from the record here that the government's investigation and prosecution of Porter in fact was prejudiced. That was an unnecessary but not an erroneous finding.

### III.

Porter's final sentencing challenge is to the two-level upward departure the district court imposed to account for the fact that Porter had involved a minor in one of his mail fraud offenses. The record reveals that a female juvenile whom we will call "X," as the parties have done throughout this case, left her home in the summer of 1995, when she was fifteen years old. X was a relative of Porter's wife, and she therefore lived with Porter and his wife for the first few weeks after leaving home. During that time, Porter approached an agent of the Monroe County Protective Services Agency and discussed obtaining custody of X, but the agent was not in favor of Porter's proposal. Porter then rented X a mobile home in Owen County, Indiana. Yet before going to Owen County, X apparently expressed some concern to Porter that she would not be receiving any schooling. Porter told X that he would enroll her in home schooling but that she would need a Post Office box in order to receive the necessary materials. Porter therefore took X to a Mail Boxes, Etc. location in Greenwood, Indiana on September 22, 1995, so that she could rent a Post Office box. Porter provided X with a false high school identification card bearing X's picture but the name "Gerry True." He also gave her an application form and $40.00 to pay for the mailbox. X completed the application, paid $35.00 to rent the mailbox, and then returned to Port-

er's vehicle, giving him the $5.00 in change, the key to the mailbox she had rented, and the combination to a door that would provide access to the mailbox after hours. X never again returned to this Mail Boxes, Etc. location.

It turned out that Geraldine True was a CSC client whose account Porter handled. On September 27, 1995, CSC issued a $135,819.16 check to True after selling stocks in her account. According to its records, CSC mailed the check to True at the Post Office box X had rented in the name of "Gerry True." True told Special Agent Dunn that she had not authorized the stock sale, that the Mail Boxes, Etc. Post Office box was not the address she had provided to CSC, and that she had never authorized a change of address. In investigating the matter, Dunn learned that True's check had been deposited into a bank account controlled by Porter, who eventually used the money to purchase inventory for a personal business and to repay a loan.

■ The district court found that a two-level upward departure was appropriate because the Sentencing Commission had not adequately considered as an aggravating circumstance the fact that a defendant may use a minor in committing a mail fraud offense. The court believed that Porter's use of X here was atypical and served to take his case out of the "heartland" of mail fraud cases covered by the Guidelines. In sentencing Porter, the district court utilized the 1994 version of the Guidelines, which were in effect at the time of this mail fraud offense, but the court found support for its departure decision in a provision first appearing in the 1995 Guidelines. The present version of section 3B1.4, which took effect on November 1, 1995, provides for a two-level increase "[i]f the defendant used or attempted to use a person less than eighteen years of age to commit the offense or assist in avoiding detection of, or apprehension for, the offense." U.S.S.G. § 3B1.4 (1995).[2] The court viewed this amendment as confirmation of its position that the 1994 version of the Guidelines

failed to consider or to address the seriousness of a defendant's decision to involve a minor in criminal activity. The court then cited two further reasons for imposing the upward departure in the circumstances of this case: (1) Porter had occupied a position of special trust and confidence as X's relative, and she had been dependent on him for support and housing at the time Porter used her to further his criminal activity; and (2) involving a minor in a white collar mail fraud offense is even more insidious because the minor would not necessarily recognize the criminal nature of the activity. We review the district court's departure decision for an abuse of discretion. *Koon v. United States*, 518 U.S. 81, 116 S.Ct. 2035, 2047–48, 135 L.Ed.2d 392 (1996); *United States v. Purchess*, 107 F.3d 1261, 1270 (7th Cir.1997). That standard, however, encompasses "review to determine that the discretion was not guided by erroneous legal conclusions." *Koon*, 518 U.S. 81, 116 S.Ct. at 2048.

■ Porter addresses three arguments to the lower court's departure decision. First, he contends that prior to the 1995 amendment, the Sentencing Commission had in fact considered this issue and had determined that an enhancement for involving a minor in a mail fraud offense was unwarranted. Alternatively, Porter argues that even if a departure for involving a minor in criminal activity may be appropriate in some cases, this was not a sufficiently rare case because, in his words, "[c]ases involving minors are commonplace." (Porter Br. at 10.) Finally, Porter contends that in practical terms, the district court applied the 1995 amendment to conduct occurring before its effective date in violation of the Constitution's Ex Post Facto Clause.

■ We may quickly dispense with the second of Porter's arguments because, fortunately, we are unable to agree with Porter that it is commonplace for an adult to involve a minor in a mail fraud offense. That is not the case in the combined experience of the members of this panel, all of whom at one

---

**2.** The commentary to that guideline explains that " '[u]sed or attempted to use' includes directing, commanding, encouraging, intimidating, coun-

seling, training, processing, recruiting, or soliciting." U.S.S.G. § 3B1.4, comment. (n.1) (1995).

time sat as trial judges in the federal system. But in any event, *Koon* indicates that on an issue like this, we must defer to the more localized vantage point of the district judge, who is better positioned than we are to make the required factual comparison between cases under the Guidelines. *See* 518 U.S. 81, 116 S.Ct. at 2047. The district court believed that Porter's decision to use X to further his criminal activity took his case out of the "heartland" of mail fraud offenses, and we are not in a position to disagree with that assessment. We therefore turn to Porter's remaining arguments.

Section 5K2.0 of the Sentencing Guidelines authorizes a departure "if the court finds 'that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines.'" U.S.S.G. § 5K2.0 (quoting 18 U.S.C. § 3553(b)). The district court found that Porter's use of a minor in his mail fraud offense was such an aggravating circumstance, but Porter contends that the Commission actually considered the matter because it chose to authorize an adjustment when a defendant involved a minor in certain drug offenses, but not when a defendant involved a minor in a mail fraud offense. *See* U.S.S.G. § 2D1.2 (providing higher base offense level for specified drug offenses involving an underage individual). Yet the departure guideline clearly states that simply because a particular factor is listed as a specific offense characteristic under one guideline but not another *does not mean* that the factor could not also be used as a basis for departure under the other guideline if found to be relevant to a defendant's sentencing. U.S.S.G. § 5K2.0; *see also United States v. Williams*, 937 F.2d 979, 984 (5th Cir.1991). We are therefore confident that the Sentencing Commission did not intend by its reference to the involvement of underage individuals in drug offenses under section

2D1.2 to preclude a departure under another guideline where the defendant may have involved a minor in a different offense. Other than section 2D1.2, Porter points to nothing in the Guidelines that would suggest the Sentencing Commission considered the matter and concluded that involving a minor in a mail fraud offense was not grounds for any enhancement. We therefore agree with the government that the district court did not abuse its discretion in finding that Porter's use of X provided an appropriate basis for departure. *Cf. United States v. Pool*, 937 F.2d 1528, 1532 (10th Cir.1991) (involving a juvenile in a robbery is an aggravating circumstance not considered in the formulation of the Guidelines); *Williams*, 937 F.2d at 983–84 (involving a juvenile in a first drug offense of simple possession not considered in the formulation of U.S.S.G. § 2D2.1); *United States v. Thornton*, 922 F.2d 1490, 1494 (10th Cir.1991) (defendant who provided drugs to her minor child was subject to upward departure); *see also United States v. McKinley*, 84 F.3d 904, 912 (7th Cir.1996) (discussing but not resolving challenge to departure based in part on fact that the defendant had involved "vulnerable juvenile females" in his criminal conduct).

We agree with the district court, moreover, that the validity of the departure here is bolstered by the 1995 amendment to section 3B1.4 of the Guidelines. That amendment, made at the behest of Congress,[3] indicates to us that both Congress and the Sentencing Commission believed the 1994 version of the Guidelines omitted a factor deemed relevant to the Guidelines sentencing scheme. *See United States v. Rainone*, 32 F.3d 1203, 1208 (7th Cir.1994), *cert. denied*, 515 U.S. 1102, 115 S.Ct. 2245, 132 L.Ed.2d 254 (1995). And as we observed in *Rainone*, "it is precisely (and only) such an omission that is a proper basis for a departure." *Id.*

Nor can we agree with Porter that the district court's reliance on the subsequent amendment to section 3B1.4 violates

---

**3.** Congress directed the Sentencing Commission in section 140008 of the Violent Crime Control and Law Enforcement Act of 1994, Pub.L. 103–322, 108 Stat. 1796, to "promulgate guidelines or amend existing guidelines to provide that a defendant 21 years of age or older who has been convicted of an offense shall receive an appropri-

ate sentence enhancement if the defendant involved a minor in the commission of the offense." *See* 28 U.S.C.A. § 994, Historical and Statutory Notes (Supp.1996). It was pursuant to this directive that the Sentencing Commission included the present version of section 3B1.4 in the 1995 Guidelines.

the Constitution's Ex Post Facto Clause. The district court did not purport to apply the 1995 amendment to conduct occurring before its effective date, as Porter insists. The court merely referenced that amendment to bolster its view that the version of the Guidelines in effect at the time of Porter's offense failed to adequately consider as an aggravating factor a defendant's use of a minor in the commission of his offense. The fact that the Sentencing Commission later remedied that omission lends support to the lower court's conclusion that the aggravating circumstance was a proper basis for departure. *See Rainone*, 32 F.3d at 1208 ("a subsequent amendment is an appropriate guide for a departure in sentencing a defendant under an earlier guideline."); *United States v. Willey*, 985 F.2d 1342, 1349–50 (7th Cir.1993) (reliance on subsequent amendment as a framework for departure does not violate the Ex Post Facto Clause); *cf. United States v. Kopshever*, 6 F.3d 1218, 1223 (7th Cir.1993) (reliance on subsequent amendment to support departure may be improper where amendment reflected a modified approach to an issue previously considered by the Sentencing Commission, as opposed to a new approach to an issue not adequately considered prior to the amendment).

AFFIRMED.