**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Brenda SZEJA and Albert Rossini,**
**Defendants–Appellants.**

**Nos. 04–1270, 04–1298.**

United States Court of Appeals,
Seventh Circuit.

Submitted March 21, 2005.*

Decided April 5, 2005.

Julie B. Ruder, John C. Kocoras, Office of the United States Attorney, Chicago, IL, for Plaintiff–Appellee.

Jeffrey B. Steinback, Chicago, IL, Santo J. Volpe, Northbrook, IL, for Defendants–Appellants.

---

* After an examination of the briefs and the record, we have concluded that oral argument is unnecessary. Thus, the appeals are submitted on the briefs and the record. *See* Fed. R.App. P. 34(a)(2).

Before BAUER, POSNER, and EVANS, Circuit Judges.

## ORDER

Husband and wife Albert Rossini and Brenda Szeja, a former attorney, pleaded guilty to two counts of mail fraud, 18 U.S.C. § 1341. On appeal Rossini and Szeja present sentencing challenges under the guidelines and *United States v. Booker*, — U.S. ——, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). We remand as to both defendants for the limited purpose of allowing the district judge to say whether he would impose the same punishments were we to order resentencing.

## I.

In 1995 Susan Sypien, the administrator of her aunt's estate and a friend of Szeja, retained Szeja to transfer stocks owned by the estate to Sypien's mother as beneficiary. Though it is contested how Rossini obtained the stock certificates, he deposited them into a brokerage account he opened under the name of the aunt's estate by using a forged power of attorney. Later that year, Rossini, who at the time was awaiting sentencing in another federal criminal case for fraud involving securities, sold the stocks by presenting the forged power of attorney for a total net proceeds of $39,910, which he transferred to other accounts, including Szeja's personal bank account. All the while Rossini and Szeja were bound by a court order permanently enjoining Rossini and anyone "acting in concert with him" from purchasing or selling securities as part of a scheme to defraud. *See SEC v. Rossini*, No. 93 C 2062 (N.D.Ill.1993).

Despite the fact that the stocks had been sold, Szeja continued to represent to Sypien that she held the stocks; she even prepared a memorandum detailing the tax consequences of transferring them out of the estate and twice in 1998 sent Sypien purported dividend checks. The charade continued until September 1998 when Sypien learned from the various companies that the stocks had been sold years earlier and confronted Rossini. The following month Rossini responded by promising to replace the stocks at their market value, but he never did so.

In January 1999 Sypien filed a civil lawsuit on behalf of the estate. Rossini and Szeja defaulted, and in July 2000 they moved to vacate the default judgment, both swearing in affidavits that Sypien had directed the sale of the stocks in 1995. At the time of the motion, a federal criminal investigation already was underway; in the fall of 1999 Rossini had been served with a grand jury subpoena for documents connected to the Sypien stocks and had been interviewed by an FBI agent and federal prosecutor, and in March 2000 Szeja had provided fingerprint and handwriting exemplars to the FBI agent.

In January 2003 a grand jury charged Rossini and Szeja with two counts of mail fraud; their submission of the false affidavits in the civil case was alleged in the indictment as part of the scheme. In September 1998 both defendants entered blind pleas of guilty to the indictment.

At sentencing, the district court applied as to both defendants a number of upward adjustments to the base offense level of 6. First, the court added 8 levels based on its determination that the loss amount was at least $70,000. The court recognized that the stocks were worth less than that amount both when they initially were converted and when the fraud was discovered, but nonetheless concluded that Rossini's promise to replace the stocks at their market value lulled Sypien until January 1999, and that it was the date the lulling ended that was relevant for calculating loss (the court also stated that, even if the appropriate loss amount yielded only 6 points because the value of the stocks was less than

$70,000, it would consider upwardly departing to account for Sypien's lost opportunity to realize the gains in her stocks). The court also added 2 points under U.S.S.G. § 2B1.1(b)(7) for violating the SEC order. Finally, the district court added 2 levels under U.S.S.G. § 3C1.1 for obstruction of justice because of the false statements made in the civil case during the federal criminal investigation.

As to the defendants individually, the district court departed upward the equivalent of one criminal history category in sentencing Rossini—from category III to IV—to account for Rossini's history of fraudulent activities and the likelihood he would commit further crimes upon his release from prison. The court sentenced Rossini to 48 months' imprisonment, a term within the range for a total offense level of 18 and a category IV criminal history. As to Szeja, the court added another 2 offense levels for abusing her position of trust as counsel for Sypien, *see* U.S.S.G. § 3B1.1, resulting in a total offense level of 20 and a category I criminal history. The district court sentenced her to 33 months, the low end of the guideline range.

## II.

Rossini and Szeja raise common and individual sentencing issues on appeal. They jointly contend that the district court incorrectly calculated the loss amount and erred in applying an increase for obstruction of justice. Rossini individually asserts that the court erred when it departed upward under § 4A1.3, and Szeja, for her part, argues that the district court erred when it increased her offense level for violating the SEC order. Finally, both defendants argue that *United States v. Booker*, —— U.S. ——, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), and *United States v. Paladino,* 401 F.3d 471, 2005 WL 435430 (7th Cir. Feb.25, 2005), require a limited remand to clarify whether the district

court would have imposed the same sentence for each under an advisory guidelines system.

We begin with the loss calculation. Rossini and Szeja argue that the district court impermissibly concluded that the loss exceeded $70,000 because the market value of the stocks never reached that level before they were converted or at the time the fraud was discovered. The district court's decision to measure the loss at the point in January 1999 when Sypien sued after Rossini failed to deliver on his promise to replace the stocks, the defendants contend, is entirely arbitrary.

■ We disagree. It is true that in fraud cases a district court typically should calculate loss based on the property's value at the time the fraud is discovered, *see United States v. Asher,* 59 F.3d 622, 624–25 (7th Cir.1995), but where it is difficult to calculate loss the district court can consider the cost of replacing the property, U.S.S.G. § 2B1.1, comment. (n. 3(C)(i)). After Sypien received Rossini's lulling letter in October 1998, but before she filed suit, the cost of replacing the stock at market value had climbed above $70,000, even by Rossini's calculations. We typically do not permit generalized expectations of profit or appreciation to enter into a guideline loss calculation. *See United States v. Schaefer,* 384 F.3d 326, 337 (7th Cir.2004). But where the defendant makes specific representations about a property's value or promises the victim a particular return on an investment, the defendant's own valuation can be used to calculate loss at sentencing. *See United States v. Porter,* 145 F.3d 897, 900–01 (7th Cir.1998) (holding that fraud loss includes interest that the defendant promised would accrue); *see also United States v. Aptt,* 354 F.3d 1269, 1277–78 (10th Cir. 2004) (when defendant fraudulently promises particular return on investment, prop-

er measure of loss includes amount promised but unpaid). Although these cases concern rates of return and interest pursuant to contracts, the principle is analogous—after all, Sypien reasonably expected, based on Rossini's letter promising to replace the stocks at a time when Rossini himself valued them at approximately $99,000, an amount well over the $70,000 mark needed to increase the offense level by 8 points.

■ Rossini and Szeja also argue jointly that the application of obstruction points impermissibly "double-counts" conduct already charged in the indictment as part of the counts of conviction. This is so, they contend, because their false affidavits in the civil suit formed part of the scheme to defraud as alleged in the indictment, and thus, they could not be used "again" as a sentencing factor. We have held that double-counting occurs only where identical conduct factors twice into a defendant's sentence because that conduct is used to impose more than one adjustment. *See United States v. White*, 222 F.3d 363, 375–76 (7th Cir.2000); *United States v. Mancillas*, 183 F.3d 682, 710 (7th Cir.1999). In this case the district court did not impose any additional offense levels under another guideline for submitting the false affidavits; the false statements counted only towards the obstruction adjustment. Thus, there was no "double-counting."

■ Next, Szeja alone argues that the district court impermissibly added 2 levels under § 2B1.1(b)(7) on the premise that she violated the 1993 SEC order prohibiting Rossini or "persons in concert with him who receive actual notice of this order" from selling or purchasing securities as part of a scheme to defraud. This adjustment was error, Szeja contends, because although she may have been aware that there was an order, she was unaware of the exact parameters of that order. The district court concluded that it was a "strong and more than reasonable inference" that Szeja was aware of the contents of the order based on the fact that she was married to Rossini at the time it was issued and the fact that the following year she had prepared a financial statement for the SEC specifically referring to the particular SEC action and the order entered against Rossini. We review a district court's factual findings for clear error, *see United States v. Parolin*, 239 F.3d 922, 928 (7th Cir.2001), and because Szeja offered nothing to rebut the reasonable inference from the government's evidence that she knew the contents of the order, we are unable to conclude that the district court committed error.

That brings us to the final contention about the guideline calculations. Rossini contests the district court's upward departure under § 4A1.3 because, says Rossini, the court failed to adequately explain its reasons for departing. We don't have to decide here whether our cases setting out a formal methodology for § 4A1.3 departures, *see, e.g., United States v. Peterson*, 256 F.3d 612, 614 (7th Cir.2001), are still applicable in light of *Booker* and the advent of purely advisory guidelines because Rossini's argument is frivolous. At sentencing the government argued that the court should depart upward the equivalent of *two* criminal history categories in view of a string of other uncharged frauds committed by Rossini between 2000 and 2002. In 2000 Rossini conned a woman out of $70,000 after she hired him to complete her overdue income tax returns and pay off the delinquent taxes. Then in 2001 and 2002 he engaged in a series of "advance fee" schemes that bilked eight other victims out of another $180,000. Against this evidence, it was *Rossini's lawyer* who suggested departing upward the equivalent of *one* criminal history category; counsel argued that Rossini's other frauds really should be viewed as a single, ongoing

scheme and that—in counsel's words—a criminal history category of "IV certainly could cover the types of conduct we are discussing here." The district court, although characterizing it as a "very close question" whether to accede to the government's position, ultimately opted to accept defense counsel's "thoughtful and creative" argument that "gave just about every benefit of the doubt" to Rossini. Given the deference we afford district courts in applying § 4A1.3, *see, e.g., United States v. Xavier,* 310 F.3d 1025, 1028 (7th Cir.2002); *Peterson,* 256 F.3d at 614, we are unpersuaded by Rossini's attempt now to backpedal from the view his lawyer expressed at sentencing when faced with the prospect of an even greater departure.

What is left is the defendants' assertion that *United States v. Booker,* —— U.S. ——, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), and *United States v. Paladino,* 401 F.3d 471, 2005 WL 435430 (7th Cir. Feb.25, 2005), require a limited remand to the district court to determine whether the court would have imposed the same sentences unfettered by the now-advisory guidelines. At sentencing the district court acknowledged it was bound by the guidelines—a position consistent with pre-*Booker* law. Yet, post-*Booker* the sentencing landscape has changed, and we cannot be certain the district court would have imposed the same sentences under an advisory guideline regime. Thus, we agree with the defendants and conclude that a limited remand is necessary. *See Paladino,* 401 F.3d 471, 480.

Accordingly, pursuant to *Paladino* we direct a limited REMAND in both appeals, while retaining jurisdiction.