In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 07-3296

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

EDGAR ARCEO,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 CR 596—**David H. Coar**, *Judge.*

———————

ARGUED APRIL 14, 2008—DECIDED JULY 28, 2008

———————

Before FLAUM, EVANS, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Edgar Arceo and a co-defendant were charged with a conspiracy to possess with intent to distribute and to distribute a controlled substance in violation of 21 U.S.C. § 846. More than six years later Arceo was arrested. He moved to dismiss the indictment based on an alleged violation of his constitutional right to a speedy trial. His motion was denied. Arceo then pled guilty to the conspiracy charge, conditioning his plea on the right to appeal the denial of his motion to dismiss. The district court sentenced Arceo to 108 months' imprisonment followed by a term of supervised release.

Arceo appeals. While he raises three issues, his main argument is that his right to a speedy trial was violated. He also challenges his sentence, arguing that the obstruction of justice adjustment under U.S.S.G. § 3C1.1 was not appropriate and that the district court did not adequately consider his cooperation with the government. After a brief presentation of the facts, we turn to Arceo's arguments.

## I. Background

On August 11, 1999, Arceo was arrested in a parking lot in Aurora, Illinois, after delivering approximately 5 kilograms of cocaine to a confidential informant who was working with the Drug Enforcement Agency ("DEA"). Immediately after his arrest, Arceo was interviewed by agents. He waived his *Miranda* rights and agreed to cooperate with law enforcement. He identified his source of supply of cocaine, Jose Salazar-Felix, and agreed to show the agents where he got the cocaine. The agents accompanied Arceo to a residence in Palatine, resulting in Salazar-Felix's arrest and eventual prosecution. Arceo subsequently was transported to the Palatine, Illinois, Police Department for processing.

Both at the time of his arrest in the parking lot and again while at the Palatine Police Department, Arceo was advised by the DEA Task Force Officer Lou Dominguez and other agents that they did not know when he would be charged, but that he would, in fact, be charged at a later time after his cooperation ended.[1] Arceo was

---

[1] Arceo argues that he was not told that he definitely would be indicted, but only that it was a possibility. However, he did

(continued...)

released from custody in order to continue his coopera-
tion. He identified his source of marijuana, Jesus
Rodriguez-Medina, and arrangements were made for a
meeting. Law enforcement and Arceo agreed to contact
each other the next day.

For two days Arceo cooperated with law enforcement.
He arranged for a marijuana transaction on August 12
with Rodriguez-Medina. Arceo did meet with Rodriguez-
Medina, who was arrested. Law enforcement and Arceo
agreed to meet the next day. On August 13, however,
when Officer Dominguez called Arceo to arrange to meet,
he was unable to reach him. Other agents likewise tried
to contact Arceo but did not succeed. As a result the
agents went looking for Arceo at his residence. They
were unable to find him and determined he had moved
out. After the usual law-enforcement checks in the North-
ern District of Illinois, Arceo still did not turn up.

On November 4, 1999, Arceo and Rodriguez-Medina
were charged in a one-count indictment with a cocaine
and marijuana conspiracy. A minute order was entered
that day, stating: "The government will seek to have the
defendant detained without bond . . . as to Edgar Arceo,

---

[1] (...continued)
not present any testimony, not even his own, or any other
evidence to support his assertion. Arceo also claims that
Officer Dominguez testified at the hearing on the motion to
dismiss that Arceo was told that he "may" be charged. The
transcript of that hearing contradicts this claim. For example,
on direct examination Officer Dominguez stated that "we
told him [Arceo] that we didn't know when we would be
charging him, but that we would charge him at a later time
after his cooperation was done."

granted. Enter order." An arraignment notice was entered the next day. The docket does not show that an arrest warrant was issued for Arceo. Between November 1999 and July 2000, there were a number of court proceedings involving Rodriguez-Medina but no docket entries reflect any activity as to Arceo. On July 27, 2000, Arceo's case was reassigned to the fugitive calendar.

In early 2001, Officer Dominguez discovered that no arrest warrant had been issued for Arceo. So on April 4, 2001, he contacted the Assistant United States Attorney ("AUSA") assigned to the case in an effort to obtain an arrest warrant. No warrant was issued, so Officer Dominguez contacted the AUSA once again in 2001 and still later in 2002, before he stopped working as a DEA task officer. The agent who took over this case made two attempts in 2003 to have an arrest warrant issued for Arceo. None was issued until December 15, 2005, however. On December 20, that warrant, along with a second warrant issued December 19, were quashed for reasons not indicated in the record, and a third bench warrant was issued.

On April 4, 2006, Arceo was arrested in the Middle District of Pennsylvania. He was living there under the assumed identity of Rowdy Sepulvida, which he admitted he purchased from a friend.

A detention hearing was held on April 5, 2006, in Pennsylvania, at which Arceo's wife of twelve years, Maria Arceo, testified. She stated that in August 1999 she and her husband left Chicago for Mexico "because of the problem" in Chicago (without any details about the nature of the problem) and that they lived in Mexico for about three years. According to Maria, it was her husband's idea to go to Mexico. She testified that she be-

lieved her husband knew he was wanted in Chicago. Maria said that they returned to the United States in 2002 and lived in Spring Grove, Pennsylvania, near her family. She also said it was about that time that Arceo began using the Rowdy Sepulvida name. She explained that Arceo could not use his own name because of the problem he had in Chicago.[2]

Prior to trial Arceo moved to dismiss the indictment. The district court held a hearing on the motion. The court considered the transcript of Maria's testimony at the detention hearing and the testimony of former Task Force Officer Dominguez about Arceo's arrest, cooperation, and flight, and then denied the motion to dismiss. The court found that Arceo was aware he had been arrested and that criminal charges would be filed, yet chose to remove himself from the United States, later returning to another jurisdiction under an assumed name until his arrest. The court indicated that the government may not have done "as much as it could have" but concluded that Arceo's attempt to avoid arrest and prosecution outweighed any negligence by the government.

On April 2, 2007, Arceo pled guilty pursuant to a plea agreement to a conspiracy to possess with intent to distribute and to distribute a controlled substance, in violation of 21 U.S.C. § 846. His plea was conditioned on his right to appeal the denial of his motion to dismiss. The dis-

---

[2] On redirect, however, Maria claimed that she had no idea what the problem in Chicago was and that Arceo started using Sepulvida's name just so he could work. We have no basis for concluding that the district court erred in disbelieving this testimony, which was more favorable to Arceo than Maria's initial testimony.

trict court accepted his conditional plea and entered a judgment against him.

At sentencing the district court heard arguments relating to adjustments for obstruction of justice under U.S.S.G. § 3C1.1 and acceptance of responsibility, and considered the 18 U.S.C. § 3553(a) sentencing factors, specifically including Arceo's family history and circumstances, his lack of criminal history since 1999, and his cooperation with the government immediately following his arrest. The court sentenced him to 108 months' imprisonment, at the bottom of the guidelines range. Arceo appeals.

## II.  Sixth Amendment Right to A Speedy Trial

Arceo's first and principal argument is that the district court erred in denying his motion to dismiss because he was deprived of his Sixth Amendment right to a speedy trial. The government responds that there was no error because Arceo's own conduct in evading law enforcement outweighs any government conduct contributing to the six-year and eight-month delay following his initial arrest. We review a speedy trial claim de novo and review the district court's factual findings for clear error. *See United States v. King*, 338 F.3d 794, 797 (7th Cir. 2003) (stating explicitly the standard of review for a Speedy Trial Act claim and applying the same standard to a Sixth Amendment speedy trial claim); *see also United States v. Sutcliffe*, 505 F.3d 944, 956 (9th Cir. 2007) (stating explicitly the standard of review for a constitutional speedy trial claim); *United States v. Brown*, 498 F.3d 523, 530 (6th Cir.) (same), *cert. denied*, 128 S. Ct. 674 (2007).

The Sixth Amendment right to a speedy trial is triggered by an arrest, indictment, or some other official accusation. *Doggett v. United States*, 505 U.S. 647, 655 (1992); *United States v. White*, 443 F.3d 582, 589 (7th Cir. 2006). In determining whether a defendant has been deprived of this speedy trial right, we consider and weigh the conduct of the government and the defendant. *Barker v. Wingo*, 407 U.S. 514, 530 (1972). In doing so we assess "whether delay before trial was uncommonly long, whether the government or the criminal defendant is more to blame for that delay, whether, in due course, the defendant asserted his right to a speedy trial, and whether he suffered prejudice as the delay's result." *Doggett*, 505 U.S. at 651; *see also White*, 443 F.3d at 589.

The length of the delay acts as a triggering mechanism. Unless the delay is presumptively prejudicial, we need not consider the other factors. *Barker*, 407 U.S. at 530; *White*, 443 F.3d at 589. A delay approaching one year is presumptively prejudicial. *United States v. Oriedo*, 498 F.3d 593, 597 (7th Cir. 2007); *White*, 443 F.3d at 589-90. Here, more than six and one-half years passed from the time of Arceo's arrest in August 1999 to his plea in April 2007. This extraordinary delay stretches well beyond the minimum needed to trigger a further speedy trial analysis. *See Doggett*, 505 U.S. at 652. This lengthy delay weighs in favor of Arceo.

The second factor is the reason for the delay, and it is this factor that is at the heart of Arceo's claim. Different weights should be given to different reasons for delay: "A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence . . . should be weighted less heavily . . . ." *Barker*,

407 U.S. at 531. Arceo contends the delay is attributable to the government's negligence. The government argues that the principal reason for the delay was Arceo's intentional attempt to evade law enforcement.

Here there were a few reasons for the delay. For one, when Arceo was indicted on November 4, 1999, a minute entry reflects that an order for Arceo's arrest and detention would be issued but, for some inexplicable reason—the government suggests a clerical error in the clerk's office—none was entered. From the best we can glean from the record, for several months no one noticed that an arrest warrant had not been issued. Then on July 27, 2000, this case was reassigned to the fugitive calendar, which implies that someone in the clerk's office and/or court staff believed there was an outstanding warrant for Arceo's arrest. Nothing in the record before us suggests that the delay caused by this error is attributable to the government. This error seems to have contributed to over one year's worth of the delay as it was not until early 2001 that the fact that no arrest warrant had been issued was first discovered.

It was in early 2001 that Officer Dominguez discovered that no arrest warrant had been issued, so he contacted the AUSA assigned to the case in an effort to obtain an arrest warrant. In total in the next few years, the DEA agents made five attempts to have an arrest warrant issued, without success until December 15, 2005. That warrant was later quashed and ultimately a warrant issued on December 19, 2005. The government's apparent inaction in response to repeated notification that no warrant had been issued seems negligent. This negligence contributed to the delay from April 2001 through December 15, 2005, approximately four years and eight months.

However, Arceo has offered nothing to suggest that the government acted intentionally in causing this delay. Thus, while we consider the reason for this part of the total delay, we do not weight it heavily against the government. *See Barker*, 407 U.S. at 531.

But most of the blame for the delay lies with Arceo himself. Arceo intentionally fled to Mexico for three years, and returned to the United States, but not to the Chicago area. He returned instead to another jurisdiction hundreds of miles away in Pennsylvania, where he lived under an assumed name. His actions support the conclusion that he was hiding from authorities in a calculated effort to avoid arrest and prosecution. Arceo likens his case to *Doggett*, in which the Supreme Court held that an eight and one-half year delay between the defendant's indictment and arrest violated his speedy trial rights. Doggett was indicted with others for a drug conspiracy. *Doggett*, 505 U.S. at 648. When law enforcement attempted to arrest him, they learned that he had left the country a few days before. The DEA attempted to catch Doggett on his return to the United States, but these efforts ceased with time. Approximately two and one-half years after his indictment, Doggett returned to the United States, where he lived openly under his own name. He later was found pursuant to a mass credit check on several thousand persons subject to outstanding arrest warrants. *Id.* at 649-50. The Court deferred to the lower court's finding that the delay was attributable to the government's negligence. *Id.* at 652-53.

Two facts easily distinguish this case from *Doggett*: First, Doggett "lived openly under his own name" upon his return to the United States. *Id.* at 649. Thus, the Court observed that for six years, the government investigators

made no serious effort to find Doggett, but had they done so "they could have found him within minutes." *Id.* at 653. Here, in contrast, Arceo was living under an assumed name: he was in hiding. It cannot be said that law enforcement could have quickly and easily found him within minutes if only they had made an effort. While Arceo was arrested relatively quickly—three and one-half months—after the December 2005 arrest warrant was issued, this was due in part, no doubt, to good investigative work and perhaps some good luck. Another significant difference is that Doggett had no knowledge of the charges against him until his arrest. *Id.* at 653-54. While Arceo may have been unaware of the indictment against him until his April 2006 arrest, the district court found that when Arceo fled in August 1999, he was aware that criminal charges were forthcoming. This finding is well-supported by the record. Both at the time of his arrest in the parking lot and again while at the police department, Arceo was advised by Officer Dominguez and other agents that he would be charged, though they did not know *when* the charges would be filed. Thus, the district court's finding in this regard is not erroneous.

Arceo makes much of testimony by Officer Dominguez about conversations with Arceo "as to when he would be charged with a crime" and whether the officer told Arceo on August 12 that he was going to be charged, to which Officer Dominguez responded "no" and "I don't recall." This testimony does not contradict the officer's testimony that he and others had discussed with Arceo several times on August 11 that he would be charged following his cooperation. Arceo argues that he was using an assumed name simply for employment pur-

poses, but the district court could reasonably reject this explanation. While the government may have acted negligently, Arceo acted intentionally and he therefore bears more blame for the delay. Thus, the reason for the delay weighs in favor of the government.

The third factor is somewhat neutral. Arceo was not informed that the indictment had been returned against him until his arrest. *See id.* at 653-54 (stating that if defendant knew of his indictment for years before he was arrested, the third factor "would be weighed heavily against him," but where he was not aware of the indictment prior to his arrest, he "is not to be taxed for invoking his speedy trial right only after his arrest"). And Arceo did move to dismiss the indictment, asserting his speedy trial rights. But Arceo had been arrested and knew that he would be charged following his cooperation. Upon fleeing to Mexico, he was no longer cooperating, so he was on notice that charges would soon follow. The fact that Arceo moved to dismiss the indictment for a speedy trial violation cuts in his favor; however, the fact that he knew that charges were certain but fled the jurisdiction to avoid prosecution cuts against him.

The fourth factor is prejudice to the defendant. Arceo does not claim that he suffered any particularized prejudice caused by the delay. He argues that the extraordinary length of the delay suffices to establish prejudice. Proof of particular prejudice is not necessary in every case; in some cases of excessive delay prejudice may be presumed. *Id.* at 655-56; *Oriedo*, 498 F.3d at 600. Yet this presumed prejudice is not sufficient to carry a speedy trial claim "absent a strong showing on the other *Barker* factors." *Oriedo*, 498 F.3d at 600. Again, Arceo likens his case to *Doggett* where the presumptive prejudice caused

by the delay was sufficient to warrant relief for a speedy trial violation. But there, Doggett could not be blamed for the delay; but for the government's egregious negligence, he would have been prosecuted six years earlier than he was. *Doggett*, 505 U.S. at 657-58. Here, in sharp contrast, Arceo is at fault. He acted intentionally and deliberately in attempting to avoid arrest and prosecution. This conduct weighs heavily against him and outweighs the government's negligence. Considering all of the circumstances including the absence of any particularized prejudice to Arceo, we conclude that the district court did not err in concluding that Arceo had not shown a deprivation of his constitutional speedy trial right.

### III.  Obstruction of Justice

Arceo's next challenge is to the district court's application of the obstruction of justice adjustment under U.S.S.G. § 3C1.1. We review an obstruction of justice finding for clear error, giving deference to the district court's application of the guidelines to the facts. *United States v. King*, 506 F.3d 532, 535 (7th Cir. 2007) (per curiam); *United States v. Porter*, 145 F.3d 897, 902 (7th Cir. 1998). The pertinent question under § 3C1.1 is " 'whether the defendant's conduct evidences a willful intent to obstruct justice.' " *Porter*, 145 F.3d at 903 (quoting *United States v. Draves*, 103 F.3d 1328, 1338 (7th Cir. 1997)). While the application note to § 3C1.1 states that "avoiding or fleeing from arrest" generally will not warrant an obstruction of justice enhancement, U.S.S.G. § 3C1.1, cmt. n.5(d); *see Porter*, 145 F.3d at 903, our cases draw a line between " 'panicked, instinctive flight,' " which does not warrant an enhancement, and " 'calculated evasion,' " which does. *Porter*, 145 F.3d at 903 (quoting *Draves*, 103 F.3d at 1337).

Arceo engaged in conduct that clearly supports the obstruction of justice finding. *See King*, 506 F.3d at 535 (concluding challenge to obstruction of justice finding would be frivolous where defendant while on pretrial release absconded for two months, obtained a driver's license using a stolen social security number, and used that false identity to buy a car); *Porter*, 145 F.3d at 903-04 (concluding obstruction of justice enhancement warranted where defendant, though not yet arrested, knew an indictment against him was imminent and nonetheless fled the jurisdiction and changed his identity). Arceo knew he would be charged with a crime; yet he fled the jurisdiction, living in Mexico for several years and later returning to the United States, relocating to distant Pennsylvania under an assumed name.

Arceo argues that it is not clear that he fled the jurisdiction because he knew he would be charged with a crime. He claims that he only knew that he *might* be charged. The record belies this claim. While Officer Dominguez did not tell Arceo specifically *when* he would be charged and did not discuss with him on August 12 whether he would be charged at all, it is undisputed that Arceo was told several times on August 11, both when he was arrested and while he was being processed at the police station, that he would in fact be charged. Nothing in the record suggests that these assertions were ever retracted. Arceo suggests that he had reason to believe he might not be charged because of his substantial assistance to law enforcement over two days, but he points to nothing in the record—nothing said by Officer Dominguez, another DEA agent, or any other law enforcement or government agent—to make such a belief reasonable. Arceo also suggests that he left Chicago

because of fear of retaliation from the individuals who were arrested because of his cooperation. But again he offers no evidence to substantiate this assertion. We agree that Arceo's conduct was a calculated effort to evade prosecution, and we find no error in the district court's obstruction of justice finding.

## IV.  Substantial Cooperation

The third issue is whether the within-guidelines sentence was reasonable given Arceo's substantial cooperation with the government. We review a sentence for reasonableness under an abuse-of-discretion standard. *United States v. Omole*, 523 F.3d 691, 696 (7th Cir. 2008) (citing *Gall v. United States*, --- U.S. ----, 128 S. Ct. 586, 597 (2007)). A properly calculated within-guidelines sentence is presumed reasonable. *Id.* (citing *Rita v. United States*, --- U.S. ----, 127 S. Ct. 2456, 2462-63 (2007)). But this presumption may be rebutted by a showing that the sentence is unreasonable when considered against the § 3553(a) factors. *United States v. Harvey*, 516 F.3d 553, 556 (7th Cir. 2008).

Arceo does not argue that the district court erred in calculating the applicable guidelines range. Nor does he dispute that he had an opportunity to identify the § 3553(a) factors that might warrant a non-guidelines sentence. The record shows that he did. The record also reflects the district court's consideration of the § 3553(a) factors. Arceo's objection is more pointed. He contends that his sentence was unreasonable because it did not adequately account for his substantial cooperation with law enforcement. In his view, he should have received a below-guidelines sentence.

The district court did account for Arceo's cooperation though. The court sentenced him at the low end of the guidelines range (108-135 months) instead of the mid-range—where the judge said he typically sentences defendants—based in large measure on Arceo's cooperation. Thus, Arceo received 108 months instead of 122. We think this effective 14-month reduction adequately accounts for Arceo's cooperation. While the court could have relied on Arceo's cooperation as a basis for going below the guidelines range, it was not required to do so. Neither fairness nor the requirement that a sentence be no greater than necessary compels the conclusion that a sentence at the very bottom of the guidelines range was unreasonable. The 108-month sentence adequately accounts for Arceo's cooperation along with the other facts and circumstances of the case. This case exemplifies what sentencing discretion is all about. *See United States v. Willis*, 523 F.3d 762, 770 (7th Cir. 2008) ("[T]he district court has substantial discretion in choosing a reasonable sentence.").[3]

---

[3] Arceo also suggests that his cooperation would justify a U.S.S.G. § 5K1.1 motion and the government's explanation for not making the motion—"office policy"—was a "whim." "[W]e may review the government's refusal to move for a departure based on substantial assistance only for unconstitutional motive." *United States v. Bosque*, 312 F.3d 313, 318 (7th Cir. 2002). Arceo does not argue that the government's decision not to make a § 5K1.1 motion was based on an unconstitutional motive. Moreover, although Arceo initially cooperated with law enforcement, providing valuable information which led to the arrest and convictions of Rodriguez-Medina and Salazar-Felix, a short while later he fled the jurisdiction. His flight left

(continued...)

Arceo has not shown that his sentence at the very bottom of the guidelines range was unreasonable. Accordingly, we conclude that the district court did not abuse its discretion in imposing Arceo's sentence.

## V. Conclusion

For the foregoing reasons, Arceo's conviction and sentence are AFFIRMED.

---

[3] (...continued)
him unable to follow through with his initial cooperation by testifying, if necessary, at Rodriguez-Medina's and Salazar-Felix's trials. From the government's perspective, Arceo's deliberate flight made him unqualified for a § 5K1.1 motion. That determination does not appear to be the product of an unconstitutional motive.

---