**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Thomas P. McCORMICK,
Defendant–Appellant.**

**No. 93–2580.**

United States Court of Appeals,
Eighth Circuit.

Submitted March 18, 1994.

Decided July 5, 1994.

Rehearing Denied Aug. 3, 1994.

---

Patrick R. Townley, Minneapolis, MN, argued (Thomas M. Kelly, on brief), for appellant.

Jeffrey S. Paulsen, Asst. Atty. Gen., Minneapolis, MN, argued, for appellee.

Before MAGILL, Circuit Judge,
HEANEY, Senior Circuit Judge, and
HANSEN, Circuit Judge.

HANSEN, Circuit Judge.

Thomas P. McCormick appeals his conviction and sentence for distributing methamphetamine, conspiring to manufacture methamphetamine, income tax evasion, money laundering, and structuring monetary transactions. McCormick challenges the sufficiency of the evidence to sustain his conviction, the district court's[1] determination of the quantity of methamphetamine involved in the offense, and the district court's two-level upward adjustment to his base offense level for obstruction of justice. We affirm.

## I.

McCormick began working in the warehouse of Midland Scientific, a chemical supply company in Omaha, Nebraska, in 1976 and eventually became the manager and majority shareholder of Midland Scientific of Minnesota. As manager of the Minnesota company, McCormick arranged for it to purchase a total of 77 kilograms of methylamine hydrochloride and 22.74 kilograms of sodium cyanoborohydride, chemicals that can be used as precursor chemicals in the manufacture of methamphetamine. Midland employees noted that while these chemicals were being purchased they were not being shown as sold in recorded sales transactions. Instead, quantities of these two chemicals were mysteriously disappearing from the compa-

1. The Honorable David S. Doty, United States District Judge for the District of Minnesota.

ny's inventory while McCormick instructed employees to order more. On one occasion, an employee helped load several cases of sodium cyanoborohydride in McCormick's van. When questioned by the employee, McCormick became agitated and did not explain where he was taking the shipment. Employees also noticed suspicious behavior by McCormick and white powder by his nose which suggested drug use.

William Saunders was arrested in Omaha, Nebraska, in 1989 after officers executed a search warrant at his residence and seized drugs, cash, a notebook, a motorcycle, and firearms. He was in possession of approximately 23 ounces of methamphetamine that he said he had purchased from McCormick. The notebook seized was Saunders' drug ledger. It contained calculations of money Saunders owed and paid to Tom McCormick for the purchase of approximately 21 kilograms of methamphetamine. Saunders said that he had purchased methamphetamine from McCormick from 1987 through 1989, that this ledger covered only 12 to 18 months of that period, and that the ledger containing the earlier transactions had been destroyed. According to Saunders, McCormick said he knew a chemist in California, whom McCormick referred to as the "professor", who actually made the methamphetamine. Saunders also testified that McCormick said he had acquired two 55–gallon drums of phenyl-two-propanol (P2P) in Mexico. McCormick took Saunders' orders and arranged for distribution of the methamphetamine to customers. Saunders generally received methamphetamine from McCormick through Federal Express, and the methamphetamine would be packed in boxes stuffed with California newspapers. Occasionally McCormick delivered an order to a storage locker and personally gave Saunders the key. Saunders said that he paid for the methamphetamine in cash at a rate of $900 to $1,000 per ounce.

After Saunders' arrest, he agreed to cooperate with authorities and attempted to set up a controlled buy from McCormick. To this end, authorities taped several telephone conversations between Saunders and McCormick. The conversations were guarded in language but lend corroboration to Saunders'

testimony. In the first conversation, Saunders asked if he could "get something," (Gov't App. at A2), and McCormick said that the timing was good because he was going to see "our professor," and "he's already got ... you know, as much as you received." (*Id.* at A3.) McCormick eventually agreed to meet with Saunders at a hotel in Minneapolis, and the government videotaped the meeting through a hidden camera. Immediately upon entering Saunders' hotel room, McCormick patted him down in search of recording devices. They then left the hotel. At a bar, McCormick discovered a hidden tape recorder in Saunders' coat pocket while Saunders was in the restroom. After this discovery, McCormick refused to have any further contact with Saunders.

McCormick also had a large supply of unexplained cash. He made large purchases of furs and jewelry with cash. McCormick underrepresented his income on his tax returns, and a government investigation showed that he laundered drug money through his company by investing cash drug profits into the company as "loans" to keep the company afloat. McCormick also structured at least two financial transactions in excess of $10,000 in order to avoid generating currency transaction reports.

McCormick was charged in a seven-count indictment with one count of distributing methamphetamine in violation of 21 U.S.C. § 841(a)(1) & (b)(1)(A); one count of conspiring to manufacture methamphetamine in violation of 21 U.S.C. § 846; two counts of tax evasion in violation of 26 U.S.C. § 7201; one count of money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i); and two counts of structuring a monetary transaction in violation of 31 U.S.C. § 5324(3). During trial, a chemist testified that there are several different methods of manufacturing methamphetamine. Using one method, 22.74 kilograms of sodium cyanoborohydride (the amount a Florida drug company sold to McCormick but which "disappeared" from his inventory) would yield a quantity of 38.9 kilograms of methamphetamine. The chemist determined that the methamphetamine seized from Saunders was not manufactured by this method. However, given the amount

of P2P available to McCormick, according to statements attributed to McCormick, an additional 180.5 kilograms of methamphetamine could have been produced by a different method of manufacture. McCormick testified at trial, stating that he never sold methamphetamine to Saunders and that his only contact with Saunders concerned his attempt to collect a $20,000 loan he made to Saunders. McCormick denied any knowledge of the "professor".

The jury convicted McCormick on each count of the indictment. In applying the Sentencing Guidelines, the district court determined that McCormick was responsible for a quantity of 38.9 kilograms of methamphetamine. The district court awarded McCormick a three-level downward adjustment in his offense level for his minor role in the manufacture of methamphetamine and added a two-level upward adjustment for obstruction of justice. The district court departed from criminal history category III, finding that category II more adequately reflected the seriousness of McCormick's criminal history. The district court sentenced McCormick to a term of 188 months of imprisonment to be followed by 5 years of supervised release. McCormick appeals.

## II.

McCormick first argues that the evidence at trial was insufficient to support his conviction. When evaluating the sufficiency of the evidence, we view the entire record in the light most favorable to the government, and we draw from the facts all reasonable inferences in favor of the government. *United States v. Weston,* 4 F.3d 672, 674 (8th Cir. 1993). We must affirm if we conclude that " 'a reasonable factfinder could have found guilt beyond a reasonable doubt.' " *United States v. Pardue,* 983 F.2d 843, 847 (8th Cir.) (quoting *United States v. Garrett,* 948 F.2d 474, 476 (8th Cir.1991) (citation omitted)), *cert. denied,* — U.S. —, 113 S.Ct. 3043, 125 L.Ed.2d 728 (1993).

■ The government relied primarily on the testimony of Saunders, documentary evidence in the form of Saunders' drug ledger, and tape recordings of conversations between Saunders and McCormick. The government also presented the testimony of drug company owners who had sold the precursor chemicals to McCormick, several Midland Scientific employees who witnessed McCormick's actions and the mysterious disappearance of the precursor chemicals, law enforcement officers who investigated the operation, and testimony concerning McCormick's large supply of unexplained and unreported cash. Although the methamphetamine seized from Saunders (which Saunders testified was part of a larger quantity he had acquired from McCormick in November of 1988) was not made from precursor chemicals like those which disappeared from Midland's inventory, McCormick told Saunders that he had access to 110 gallons of P2P. The chemist testified about a method of manufacture that produces methamphetamine with P2P and without the precursor chemicals that disappeared from Midland. McCormick stopped ordering the "disappearing" precursor chemicals through Midland in 1987 after an unannounced inspection of Midland by the fire marshal resulted in a search warrant which authorized a later after-hours search of the premises for leaking drums of toxic substances. Nevertheless, the evidence shows that he continued conspiring to manufacture methamphetamine with the "professor" as evidenced by Saunders' testimony and the taped telephone conversations in May of 1989.

McCormick argues that Saunders' testimony was neither credible nor corroborated, required impermissible speculation, and that the government relied too heavily on his wealth as evidence of drug activity. McCormick's attempt to compare his case to the finding of insufficient evidence in *Weston* is not persuasive. In *Weston,* the government witness had no basis but speculation for his opinion that the defendant intended to manufacture methamphetamine from the precursor chemicals the defendant possessed. 4 F.3d at 675. By contrast, Saunders' testimony was based upon personal knowledge of McCormick's words and actions and not mere speculation as in *Weston.* Also, as noted above, the evidence of wealth was not the sole indication that McCormick was involved in drug activity. The jury was entitled to weigh the evidence and make credibil-

ity determinations. *See United States v. Rogers,* 939 F.2d 591, 595 (8th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 609, 116 L.Ed.2d 632 (1991). After carefully reviewing the entire record and considering each of McCormick's arguments, we conclude that a reasonable factfinder could have found guilt beyond a reasonable doubt. The evidence is sufficient to sustain McCormick's conviction.

## III.

 McCormick's second argument is that the district court's drug quantity determination for sentencing purposes is not supported by the evidence and that a heightened standard of proof should apply in this case. We have repeatedly held that the government must prove the quantity of drugs involved in the offense by a preponderance of the evidence. *See United States v. Behler,* 14 F.3d 1264, 1272 (8th Cir.1994); *United States v. Smiley,* 997 F.2d 475, 481 (8th Cir.1993); *United States v. Galloway,* 976 F.2d 414, 425 (8th Cir.1992) (en banc), *cert. denied,* —— U.S. ——, 113 S.Ct. 1420, 122 L.Ed.2d 790 (1993). This case does not implicate a heightened standard of proof because it does not involve any uncharged relevant conduct; the district court merely made a quantity determination under U.S.S.G. § 2D1.4(a) (Oct.1987) [2] for McCormick's conspiracy conviction. *See Behler,* 14 F.3d at 1272. We review the district court's quantity determination under the clearly erroneous standard. *Smiley,* 997 F.2d at 481. The Sentencing Guidelines provided the following guidance in making a quantity determination:

> Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the sentencing judge shall approximate the quantity of the controlled substance. In making this determination, the judge may consider, for example, the price generally obtained for the controlled substance, financial or other records, similar transactions in controlled substances by the defendant, and the size or capability of any laboratory involved.

U.S.S.G. § 2D1.4, comment. (n. 2) (Oct. 1987).[3] The district court sentenced McCormick based upon a quantity of 38.9 kilograms of methamphetamine. The chemist testified that this quantity could have been produced from the precursor chemicals that "disappeared" from Midland's inventory using one method of manufacture. The chemist also testified that by using an alternative method of manufacture involving only the P2P, McCormick could have manufactured yet an additional 180.5 kilograms of methamphetamine. Saunders' ledger indicates that McCormick sold approximately 21 kilograms of methamphetamine to Saunders over a 12- to 18-month period out of an approximate 2-year course of dealing with McCormick, and Saunders testified that the first ledger recording earlier transactions had been destroyed.

McCormick argues that the quantity of 38.9 kilograms is clearly erroneous because it is based upon the amount of precursor chemicals that disappeared from Midland's inventory, which the chemist determined were not used in manufacturing the methamphetamine seized. McCormick argues that there is no evidence that the precursors missing from Midland's inventory were ever manufactured into methamphetamine and that he should be accountable only for the amount seized from Saunders or at most, the 21 kilograms indicated in Saunders' ledger.

We disagree with McCormick's reasoning. McCormick was convicted of conspiracy to manufacture methamphetamine, and the amount of methamphetamine seized does not reflect the scale of the offense. The jury did not determine what chemicals or what methods of manufacture were used throughout the conspiracy to produce the methamphetamine. The record indicates that McCormick had access not only to the precursor chemicals missing from Midland but also to 110 gallons of P2P, from which 180.5 kilograms of methamphetamine could be manufactured even after some of the P2P had been used in the manufacturing process that involved the "disappearing" precursor chemicals. Given this

**2.** The district court used the Sentencing Guidelines in effect in July of 1988.

**3.** This section is now incorporated into U.S.S.G. § 2D1.1, comment (n. 12) (Nov.1993) and has not been substantially altered.

evidence, the district court chose a conservative estimate of the quantity of methamphetamine that McCormick was capable of manufacturing with his accomplice.

McCormick's reliance on *United States v. Burks,* 934 F.2d 148 (8th Cir.1991) (finding district court's quantity estimation unsupported by the evidence), in arguing that the quantity approximation here is unsupported is misplaced. Burks was convicted of attempted delivery, not conspiracy to manufacture, so the quantity evidence relied upon by the district court related to uncharged conduct. *Id.* at 152. The *Burks* court calculated the quantity of drugs based upon the manufacturing capability of an alleged lab, the existence of which this court found to be exaggerated, fabricated, and inconsistent with Burks' conduct. In this. case, McCormick was convicted of conspiring to manufacture methamphetamine, and the quantity determination was based upon a conservative estimate of the known precursor chemicals available to McCormick. Accordingly, we conclude that the district court's quantity determination is not clearly erroneous.

### IV.

McCormick's final argument challenges the district court's addition of a two-level upward adjustment to his base offense level for obstruction of justice. *See* U.S.S.G. § 3C1.1. We review a district court's findings in support of an enhancement for obstruction of justice under the clearly erroneous standard. *United States v. Clay,* 16 F.3d 892, 896 (8th Cir.1994). "The adjustment cannot be given simply because a defendant testifies in his own behalf and the jury disbelieves him." *United States v. Willis,* 940 F.2d 1136, 1140 (8th Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 1411, 122 L.Ed.2d 782 (1993). We give due regard to the district court's observations and express finding that a defendant lied to the jury. *See United States v. Benson,* 961 F.2d 707, 709 (8th Cir.1992).

The district court applied the two-level enhancement after expressly finding that McCormick perjured himself at trial by testifying that his contact with Saunders was limited to attempts to collect a $20,000 loan he made to Saunders and that he did not

know the "professor." Saunders' testimony of McCormick's prior statements and the tape recordings of telephone conversations between Saunders and McCormick provide substantial evidence that McCormick's statements at trial were false. We conclude that the district court did not clearly err in adding a two-level enhancement based upon obstruction of justice.

### V.

We have carefully reviewed all of McCormick's arguments and find them to be without merit. Accordingly, we affirm the judgment of the district court.

HEANEY, Senior Circuit Judge, concurs in the result.