**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Ian P. WALCOTT, Defendant–Appellant.**

No. 94–3859.

United States Court of Appeals,
Eighth Circuit.

Submitted May 15, 1995.

Decided July 31, 1995.

Rehearing and Suggestion for Rehearing
En Banc Denied Sept. 20, 1995.

David Loren Warg, St. Paul, MN, argued, for appellant.

Rabea Jamal Zayed, Asst. U.S. Atty., argued (Jeanne J. Graham, Asst. U.S. Atty., on the brief), for appellee.

Before WOLLMAN and MORRIS SHEPPARD ARNOLD, Circuit Judges, and BOGUE,* Senior District Judge.

BOGUE, Senior District Judge.

Ian P. Walcott appeals both his sentence and his conviction of conspiracy to structure currency transactions, structuring currency transactions, money laundering (14 counts), and distribution of crack cocaine in violation of Title 18 United States Code, Sections 371, 1956, 3146, Title 21, United States Code, Section 841, and Title 31, United States Code, Section 5324. On appeal, he argues that: (1) the evidence was insufficient to support the guilty verdicts; and (2) the district court erred in calculating his sentence in that it improperly imposed a two-level increase for obstructing justice. We affirm the conviction and the district court's [1] sentence.

### I.

This is a factually complicated case involving numerous drug dealers, multiple aliases (some overlapping), multiple addresses, numerous wire transactions, and a time line encompassing several years. Walcott, under the name Carl Banks (one of his many aliases), initially came under suspicion of authorities when Banks began to repeatedly wire large amounts of money via Western Union. Western Union Financial Services submitted to the Internal Revenue Service (IRS) several suspicious cash transaction reports to alert them of possible money structuring on the part of Banks. On the other end of the wire transfers was one Donald Carter, a/k/a Delroy Green, a/k/a Errol Jackson. Most of the transfers credited to Walcott were initiated in Minneapolis or New York, while receipt by Carter was invariably in California. Telephone records produced at trial indicated that during the time the individuals were involved in wiring money, they also had a high degree of telephone communication.[2]

Evidence presented at trial indicated that these two individuals, under various aliases, transferred large sums of money over the wire several times between March of 1990 and July 1990. When wiring money to Carter, Walcott often put down addresses and telephone numbers which did not match. All transactions, on their face, were executed in a manner not requiring reporting to the IRS.[3] Carter has subsequently pled guilty via Fed.R.Crim.P. 20 to the complete indictment, except count 18 (distribution of crack cocaine). At trial Carter admitted to knowingly and willfully structuring money. He also admitted to conducting financial transactions to conceal or disguise the nature of proceeds of illegal activity. Hand-writing experts and employees at Western Union outlets connected Walcott to the transfers in question.

The record is replete with indications of Walcott's involvement in the drug distribution trade. Testimony revealed that from at least 1988 to 1991, Walcott sold cocaine to Girrard Russell, Shirley Williams, and Gerald Williams and employed Blanche Toney in delivering packages from Donald Carter to himself. The Williamses (mother and son) testified that during 1988 to 1990 they received cocaine from Walcott on a weekly and daily basis respectively.

---

* The HONORABLE ANDREW W. BOGUE, Senior United States District Judge for the Western Division of the District of South Dakota, sitting by designation.

1. The Honorable David S. Doty, United States District Court Judge for the District of Minnesota.

2. Phone records showed that between February and April 1990, 114 calls were made between a Los Angeles number listed to Carter's then girlfriend, and a number listed under the name of a girlfriend of Walcott's in Minneapolis. From March to October 1990, 247 calls were made between the Los Angeles number and a New York number listed to Andrea Wilson, the mother of Walcott's children.

3. Western Union is required by the federal government to report to the IRS, via a currency transaction report, any person sending over $10,000 within one business day. Western Union records indicated that multiple transfers were sent by Carl Balks on the same day or within 24 hours of an earlier transaction. No single transfer ever exceeded $10,000, although transfers of lesser amounts wired on the same day often exceeded this total in combination. Other transfers giving rise to the current charges were between $1,000 and $7,000.

Walcott's involvement in the drug trade is further indicated by evidence of substantial wealth, without an apparent legitimate source of income.[4] He was known to have three apartments in Minneapolis and at least one apartment in New York. Over a two-year period, Walcott either owned or rented a Volvo, a Dodge Raider, a Mercedes, a Trans Am, a Cavalier, a Beretta and a Chevett. Consistent with individuals involved in the drug trade,[5] Walcott often listed names of other people when renting apartments, vehicles or acquiring telephone service. Walcott also paid for several trips that he and a girlfriend, Sonja Bergsven, took to Los Angeles, New York and Washington D.C. and several trips he took by himself to Los Angeles, New York, Miami, and Jamaica. Finally, Bergsven testified that Walcott often possessed large quantities of cash, as much as $75,000, during the period of time they were involved.

On October 14, 1990, a package arrived at the Minneapolis airport from New York's LaGuardia Airport. The package had been sent by Carl Banks to a Michael Lyons at an address in Richfield, Minnesota. Narcotics officers at the airport recognized the name Carl Banks from a previous narcotics investigation. The package was detained and searched by a K-9 unit and subsequently found to contain 143.4 grams of crack cocaine. After Lyons picked up the package, he was arrested.[6] At the time of his arrest, Lyons was driving a vehicle registered to Carl Banks. A search of the Richfield apartment, listed under the name Sharon LaFayette (an alias of Blanche Toney), uncovered a marijuana cigarette, guns, scales, and cutting agents, as well as numerous items linking Walcott, under the name Carl Banks, to the apartment. Testimony at trial indicated that

Walcott's handwriting was on the package sent from New York.[7]

Based on the above evidence, an indictment was filed in the District of Minnesota against Walcott in December, 1992. After the indictment, IRS agents made efforts to arrest Walcott. In January 1993 IRS agents went to a New York apartment to which Walcott was connected with an arrest warrant. Walcott could not be found, but contact with him was subsequently made when Walcott himself called into the IRS office. He was told in essence that the agents needed to see him and that he should surrender. The pending charges were later explained to an attorney who had been in contact with Walcott. Walcott's girlfriend in New York, Andrea Wilson, and his mother were both contacted by agents and were told that Walcott was wanted for serious charges and that he should turn himself in. Despite these numerous communications, Walcott did not surrender.

In May of 1993, authorities obtained information which indicated Walcott was living with Andrea Wilson in Miramar, Florida. The following month agents executed a search warrant at the Florida residence, but were unable to locate Walcott. Wilson informed the agents that Walcott had just left for New York and further indicated that the couple had moved to Florida because of the stress involved in the government's pursuit of Walcott. Although Walcott used his own name in certain of his Florida dealings (e.g., the apartment was rented to Ian Walcott and his mother), another alias, Selvin Foster, was employed for other matters.

At approximately 9:10 a.m. on April 22, 1994, agents from the IRS and Miramar police officers surrounded that house Walcott

4. Walcott did not file any income tax returns for the years 1988 through 1991.

5. John Boulger, a special agent in the narcotics section at the Bureau of Criminal Apprehension, testified that much of Walcott's conduct and lifestyle were consistent with an individual involved in drug trafficking.

6. Lyons was later convicted in the United States District Court, District of Minnesota, of possession with intent to distribute 143 grams of crack cocaine. He was subsequently sentenced to 151

months imprisonment followed by a five year term of supervised release. See, *United States v. Lyons*, 957 F.2d 615 (8th Cir.1992).

7. In his defense, Walcott offered his passport which indicated he was out of the country on the date the package was sent. In rebuttal the government produced a document examiner from the Immigration and Naturalization Service who testified that, in her opinion, the passport was not authentic.

was occupying. The occupants of the house were informed by telephone that the authorities had an arrest warrant and wanted all occupants out of the house. Wilson came out with the couple's infant son but a standoff ensued with respect to Walcott. Approximately five hours later an IRS agent returned to the scene with a search warrant for the person of Walcott. At about 4:15 p.m. the authorities identified themselves, announced they had a warrant for Walcott's arrest, and told Walcott to come out every 30 seconds over the loud speaker. When he continued to refuse to surrender, tear gas was shot into the house. Further announcements were then made, but Walcott still did not come out of the house.

Finally, a SWAT team threw flash grenades into the house and made their entry. Walcott was found hiding in the rafters above the garage and was removed from the house and arrested. At the time of his arrest, Walcott had made some effort to change his appearance. His hair, formerly short, was now in dreadlocks. He had grown a small mustache where he was previously clean shaven. He had formerly worn a gold front tooth which was missing at the time of his arrest. Walcott's capture was achieved approximately 17 months after the indictment was filed against him.

## II.

■ Walcott first argues that the evidence at trial was insufficient to support his conviction. When evaluating the sufficiency of the evidence, we view the entire record in the light most favorable to the government, and we draw from the facts all reasonable inferences in favor of the government. *United States v. McCormick*, 29 F.3d 352, 355 (8th Cir.1994); *United States v. Lyon*, 959 F.2d 701, 705 (8th Cir.1992). We must affirm if we conclude that a reasonable factfinder could have found guilt beyond a reasonable doubt. *McCormick*, 29 F.3d at 355 (citations omitted).

Having reviewed the record, we conclude that a reasonable jury could have found beyond a reasonable doubt that Walcott committed all charges contained in the indictment. The evidence showed that Walcott, in agreement with Donald Carter and others, sent and received money through Western Union, avoiding the currency transaction reporting requirements by sending money in split transactions to the same person under different aliases and in split transactions on consecutive days. A reasonable jury could have believed that numerous telephone conversations between Walcott and Carter served to coordinate the furtive transfers of cash.

There was also ample evidence presented demonstrating that the cash Walcott sent and received through Western Union represented the proceeds of illegal drug activity. Three people testified that they purchased cocaine from Walcott or one of his associates. Another witness testified that she delivered packages, at least one of which was a package of crack cocaine, directly to Walcott from Donald Carter. The government further offered evidence of Walcott's substantial wealth, despite not having any known legal source of income. Walcott's use of aliases and other conduct enlisted to hide his identity and whereabouts were consistent with involvement in the drug trade.

Walcott's primary contention is that most of the government's critical witnesses were not credible in that they were incarcerated or facing charges at the time of the trial and were offering their testimony in exchange for leniency or reduction in their respective sentences. However, the jury was aware of these matters, and it was for the jury, not this court, to weigh the witnesses' credibility. *United States v. Lopez*, 42 F.3d 463, 466 (8th Cir.1994) (citations omitted); *McCormick*, 29 F.3d at 355–56. After carefully reviewing the entire record and considering each of Walcott's arguments, we conclude that a reasonable factfinder could have found guilt beyond a reasonable doubt. The evidence is sufficient to sustain Walcott's conviction.

## III.

■ Walcott next attacks his sentence, asserting that the district court erred by imposing a two-level increase for obstruction of justice. Walcott argues that his conduct following the filing of the indictment constituted mere avoidance of or flight from arrest, impermissible grounds to support the enhancement under the United States Sentencing

Guidelines (U.S.S.G. or guidelines). This court gives due deference to the sentencing court's findings of fact underlying application of the guidelines and will accept them unless clearly erroneous. *United States v. Fetlow,* 21 F.3d 243, 247–48 (8th Cir.1994). Whether the defendant's conduct warrants an obstruction of justice enhancement turns on the legal interpretation of a guideline term and is thus reviewed de novo. *United States v. Lamere,* 980 F.2d 506, 510 (8th Cir.1992) (citation omitted).

■ Sections 3C1.1 allows the sentencing court to assess a two-level adjustment to the base offense level where the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense." U.S.S.G. § 3C1.1. Application Note 4 provides "a non-exhaustive list of examples of types of conduct that ... do not warrant application of this enhancement." U.S.S.G. § 3C1.1, comment. (n. 4). Among the conduct listed in Application note 4 is "avoiding or fleeing from arrest." U.S.S.G. § 3C1.1, comment. (n. 4(d)).

We believe Walcott's conduct following the filing of the indictment and issuance of the arrest warrant constituted more that merely avoiding or fleeing from arrest. As an initial matter, we reject Walcott's contention that until very late in the game, he did not know he was wanted by the authorities. Following preliminary contact with Walcott himself, agents contacted a number of sources with ample access to Walcott and apprised them of the serious situation. These sources included an attorney representing Walcott, Walcott's mother, and Andrea Wilson, Walcott's girlfriend and mother of two of his children with whom he later moved to Florida.

Prior to the final standoff, Walcott changed his residence, employed the use of an additional alias, and attempted to change his appearance. Not insignificantly, when authorities finally caught up with him, Walcott refused to surrender and was only re-

moved from the house following the use of tear gas and flash bombs. Significant time and resources were required to effectuate his capture. The present facts do not present a situation of instinctive fleeing from the scene of a crime. See *United States v. Mondello,* 927 F.2d 1463, 1466–67 (9th Cir.1991) (distinguishing between instinctive flight in the immediate aftermath of a crime from Mondello's three-week "cat and mouse" game to avoid authorities and subsequent capture after a forty-minute chase). Rather, it is clear Walcott willfully and deliberately engaged in conduct over a considerable amount of time calculated to mislead and deceive authorities.

The distinction between merely "avoiding or fleeing from arrest" and obstructing justice is somewhat imprecise and courts have generally relied on the facts of the particular case to determine when the enhancement is justified. While individual components of Walcott's conduct alone may not constitute obstruction of justice, when viewed cumulatively, we conclude the totality of Walcott's conduct warranted an enhancement under section 3C1.1.

### IV.

Accordingly, we affirm Walcott's conviction and sentence.