**UNITED STATES of America,**
**Appellee,**

v.

**Michael BLISS, Defendant–Appellant.**

**Docket No. 04–1163–CR.**

United States Court of Appeals,
Second Circuit.

Argued Aug. 24, 2005.

Decided Nov. 23, 2005.

Jeremiah Donovan, Old Saybrook, CT, for Defendant–Appellant.

William B. Darrow, Assistant United States Attorney, District of Vermont, Burlington, VT (Paul J. Van De Graaf, Acting United States Attorney for the District of

Vermont, Burlington, VT, of counsel), for Appellee.

Before: MESKILL, SACK and B.D. PARKER, Circuit Judges.

MESKILL, Circuit Judge.

This case requires us to consider whether the defendant's flight out of the jurisdiction and use of an alias—both prior to the filing of criminal charges—constitute obstruction of justice within the meaning of section 3C1.1 of the Federal Sentencing Guidelines ("Sentencing Guidelines" or "Guidelines").[1] For the reasons that follow, we hold that they do not.

Defendant–Appellant Michael Bliss appeals the judgment of conviction and sentence imposed by the United States District Court for the District of Vermont, Murtha, *J.*, pursuant to the Sentencing Reform Act of 1984 (as amended), 18 U.S.C. § 3551 *et seq.*, following his plea of guilty to an eleven-count indictment charging interstate transportation and use of a minor for sexual conduct and depiction, interstate travel to engage in sex with a minor, and possession of child pornography. The court imposed an aggregate term of imprisonment of 264 months,[2] followed by five years of supervised release.

Bliss contends on appeal that the district court erred in (1) imposing a two-level sentence enhancement for obstruction of justice under Guidelines section 3C1.1, (2) treating the Sentencing Guidelines as mandatory, and (3) denying without a hearing Bliss' motion to appoint substitute counsel.

Because we agree with Bliss' first two arguments, but not his third, we affirm the judgment of conviction, vacate the sentence of the district court and remand for resentencing.

## BACKGROUND

Bliss' convictions arose out of his sexual abuse of his then nine-year-old niece, "E."[3] On five occasions, Bliss traveled across state lines and stayed in motels with E where he sexually abused her, recording the abuse on videotape using a rented camcorder. He later uploaded the video recordings onto a home computer kept in his bedroom, stored the images as digitized files on the computer hard drive and burned copies onto CD ROM disks.

Bliss committed these offenses between September or December 2000 and April 2001.[4] At the time he began the offense

1. Bliss was sentenced after November 1, 2001, the effective date of the 2001 amendments to the Sentencing Guidelines. Because Bliss' offenses were committed before this date, however, the Probation Office consulted both the November 1, 2000 and the April 30, 2003 editions of the Guidelines Manual. The Probation Office noted that the results in Bliss' case were identical under either edition. Except where otherwise indicated, all references to the Guidelines are to the 2000 edition.

2. Bliss was sentenced to terms of imprisonment of 180 months for each of the transportation of a minor convictions, 264 months for each of the use of a minor and crossing state lines convictions, and 60 months for the possession of pornography conviction. All prison terms were ordered to run concurrently. In addition, the court imposed a special assessment of $1100.

3. Pursuant to the Child Victims' and Child Witnesses' Rights statute, 18 U.S.C. § 3509(d), public records do not contain identifying information about child victims of sexual assault. Accordingly, documents disclosing the identity of Bliss' victim have been either redacted or sealed.

4. There is some uncertainty as to when the offense conduct began. Counts 3 and 4 of the indictment, to which Bliss pleaded guilty, charge that the conduct occurred between September 2000 and March 2001; however, the first known date of offense conduct is December 10, 2000, the subject of Counts 1

conduct, Bliss was under furlough supervision by the State of Vermont after his 2000 release from a state prison where he had served almost ten years for three 1991 aggravated assault convictions. While on furlough supervision, Bliss resided in Vernon, Vermont, with his mother.

In late March and early April 2001, after the New Hampshire Division for Children, Youth and Family received an anonymous call indicating that Bliss had been seen kissing and hugging E "in an adult way," social workers and police from New Hampshire and Vermont conducted two interviews with E in which she described in detail the episodes of sexual abuse with which Bliss was eventually charged. Based on E's statements, Vermont police obtained a search warrant for Bliss' residence. Police executed the warrant in Bliss' absence on April 6, 2001, and seized, among other items, Bliss' computer, CD ROM disks, videocassettes, a video camera, receipts and other evidence corroborating the interstate trips. The videotape on the cassettes depicted over ninety minutes of Bliss' sexual abuse of E; the same images had been digitized, stored in the computer hard drive and burned onto the CD ROM disks.

Bliss returned home early the next morning and found the items missing from his room. His mother informed him that police had executed a search warrant and wished to speak with him. Bliss asked to borrow his mother's and stepfather's car so that he could speak with the police.

Instead of driving to the police station, however, Bliss drove to Bradley International Airport in Windsor Locks, Connecticut, where he left the car in a parking lot and rented another car in his own name. He drove the rented vehicle across the country to Los Angeles International Airport and left it in another airport parking lot. Bliss obtained employment in California and lived there for over a year.

Bliss found a job in California using his true name, under which he apparently filed W-2 tax forms.[5] Later, Bliss told his employer that in light of a court proceeding on the east coast, he wanted to be paid under a different name. There is also some evidence in the record that he may have used another alias in obtaining a cellular telephone. In addition, by the time of Bliss' arrest the following year, he appeared to have gained weight and had grown facial hair.

On June 6, 2001, the United States Attorney for the District of Vermont filed a criminal complaint, which was ordered sealed, the court issued a warrant for Bliss' arrest, and federal agents launched a major search effort for Bliss. In addition to its "typical measures," the Federal Bureau of Investigation ("FBI" or "Bureau") placed Bliss on its Ten Most Wanted List, issued an Interpol "red notice" to alert international authorities—particularly those in Canada and Mexico—to the issuance of a federal arrest warrant for Bliss, and the Bureau's Fugitive Publicity Unit arranged to have Bliss' profile aired on the

and 2 of the indictment. The presentence report is internally inconsistent on this point, as it states that "the instant offense conduct began on December 10, 2000," and four lines below in the same paragraph states "[a]s noted above, . . . the instant offense relevant conduct began in September of 2000." The likely source of confusion is that the sexual abuse is alleged to have begun in mid-September 2000, although the first instance of abuse was

not the basis for a federal criminal charge because it entailed no interstate travel. The discrepancy is immaterial for sentencing purposes because the later date, December 10, 2000, was within Bliss' period of furlough supervision.

5. At sentencing, defense counsel proffered Bliss' W-2 forms, but the court ruled that there was no "need to introduce them."

national television program "America's Most Wanted." Bliss' profile aired on that program within two weeks of the issuance of the federal arrest warrant and again shortly after the FBI placed Bliss on its Ten Most Wanted List. After pursuing myriad false leads phoned in to the "America's Most Wanted" hotline, the United States Marshals' Fugitive Task Force arrested Bliss in a Los Angeles, California motel on April 23, 2002.

Bliss was indicted for three counts of transportation of a minor for the purpose of sexual activity, 18 U.S.C. § 2423(a), five counts of use of a minor for sexual conduct and depiction, 18 U.S.C. § 2251(a), two counts of crossing state lines in order to engage in sexual conduct with a minor, 18 U.S.C. § 2241(c), and possession of child pornography, 18 U.S.C. § 2252(a)(4)(B)(i).

Following extensive pre-trial proceedings, Bliss entered a plea of guilty, without a plea agreement, to each of the eleven counts of the indictment. The United States Probation Office prepared a presentence report pursuant to Guidelines section 6A1.1. The report grouped Bliss' offenses by the five interstate trips on which Bliss took E. The Base Offense Level for each group was 27 because the offenses involved sexual exploitation of a minor. *See* U.S.S.G. § 2G2.1. The report recommended two enhancements for each group based on specific offense characteristics: (1) a four-level increase because E "had not attained the age of twelve years" at the time of the offenses, *see* U.S.S.G. § 2G2.1(b)(1)(A), and (2) a two-level increase because Bliss "was a … relative" of E, *see* U.S.S.G. § 2G2.1(b)(2).

The report also recommended a two-level enhancement with respect to each group because Bliss "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prose-cution, or sentencing of the instant offense of conviction." *See* U.S.S.G. § 3C1.1. In support of this enhancement, the Probation Office reported:

Following the Defendant's commission of the instant offense conduct, and during the initial stages of the investigation, the Defendant fled the State of Vermont and traveled to California, where he resided for approximately one year. According to the evidence, a search warrant was executed on the Defendant's residence on April 6, 2001, and on April 7, 2001, Bliss, who had learned of the search warrant execution from his mother, rented a car in Hartford, Connecticut and apparently drove to California, leaving the vehicle at the Los Angeles International Airport where it was discovered in June of 2001. Bliss remained a fugitive from justice from April of 2001 when warrants were issued for his arrest, until April of 2002 when he was arrested in California after the television show "America's Most Wanted" aired his case and a viewer telephoned the show with Bliss' whereabouts. U.S.S.G. § [ ]3C1.1 comment. (N.5) indicates that avoiding or fleeing from arrest is not considered conduct which will qualify for an enhancement under obstruction of justice[;] however, in this case Defendant far exceeded what the Guidelines refer to as initial flight from arrest, and in fact it appears that he willfully evaded arrest for an extended period of time by changing his name and relocating to California, and as such, his offense level is increased by two.

In a footnote, the report indicates that when located in California, Bliss was using the alias "Michael Clark." The Adjusted Offense Level for each group was thus 35.

Pursuant to Guidelines section 3D1.4, the report added a multiple count adjustment of four levels for a combined Adjust-

ed Offense Level of 39. The report recommended crediting Bliss with three levels for "acceptance of responsibility" under section 3E1.1(b). The Total Offense Level, then, was 36.

Bliss had three criminal history points based on previous convictions and another three because he committed the instant offenses less than two years after release from prison and while under supervised release. *See* U.S.S.G. § 4A1.1(d)-(e). Thus, the Probation Office placed Bliss in Criminal History Category III, with a corresponding imprisonment range under the Guidelines of 235 to 293 months. *See* U.S.S.G. § 5A.

By letter to the Probation Office, Bliss objected to several aspects of the draft report, including its recommendation of a two-level enhancement for obstruction of justice. He repeated these objections both in a memorandum and at sentencing. Specifically, Bliss' counsel argued that "the guidelines themselves ... explicitly say that flight prior to arrest is not obstruction." Comparing his case to *United States v. Stroud,* 893 F.2d 504 (2d Cir. 1990), Bliss' counsel argued:

> What we have here is an individual who fled before there were even charges filed. There were simply no charges filed. There was nothing wrong with Mr. Bliss relocating, which is the factual reality of what happened. He fled in panic. No question when he saw his mother and the look on her face knowing what had transpired that he decided to go to California and he did. He worked under his true name when he first arrived there. He did not make any effort to hide these vehicles. It was rented in his name. Left at an airport where it was easily found and was found.

He clearly left a trail to California. And the government indeed found him in California ultimately.

> He was under no obligation to volunteer for that, Your Honor. He left when there were no charges filed. There was simply nothing wrong with that. He left in fear, true, and in panic. But I think in a case where there is not even an indictment filed or a complaint that we can't say that that is obstruction.

> Indeed, Your Honor, the police, when they were at the house that day, the Vernon police, they could have stayed and just waited for him to come home and they didn't. They arrived, took the computers, did their search and left. There were certainly things that the Government could have done to make this a lot easier....

> This was simply a case where they had a hard time following the trail. The trail was there. Mr. Bliss left when there was nothing pending. I don't think that deserves obstruction, Your Honor.

At sentencing, the district court ultimately adopted all recommendations of the presentence report,[6] including its recommendation of the two-level enhancement for obstruction of justice.

In response to Bliss' objection to the obstruction-of-justice enhancement, the district court first stated, "[i]t doesn't seem to me that the mere fact that a warrant had not been issued at the time that Mr. Bliss fled is terribly relevant." The court reasoned, "it seems to me the fact that he was a fugitive for more than a year, or about a year, justifies the enhancement," and observed that "perhaps [Bliss] used his real name when he had the

---

**6.** The court stated that it was "not sure [Bliss] has [accepted responsibility]," but that it    would give him the credit nevertheless.

job, but as I understand it he used a different name thereafter." The court stated that it found

> instructive the *Walcott*[7] and *Porter*[8] cases from the Seventh and Eighth Circuit ... where they did find that when there's a flight that again blossoms into such facts that the defendant is missing for a long period of time, and where substantial resources are used by the Government, which is apparent here, to find him, that ... the initial panic of flight ... ripens into a type of flight that justifies an enhancement for obstruction.

The district court found that Bliss had "a specific intent to obstruct justice," observing:

> That he did have knowledge that the authorities were investigating him, that an indictment was likely to occur[9] [and] that he did flee obviously. First he fled in one car to Connecticut. Then [he] abandoned this car for a second car, which he apparently used to travel to California. He did use a false identity. And that there were extraordinary resources that were used by the Government or expended by the Government to try and find him.

Accordingly, the district court found that Bliss obstructed justice and sentenced him to an aggregate term of imprisonment of 264 months. This appeal followed.

## DISCUSSION

### I. Obstruction–of–Justice Enhancement

■ We first consider the district court's imposition of a two-level sentencing

enhancement under Guidelines section 3C1.1. Although the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), has rendered the Sentencing Guidelines advisory rather than mandatory, district courts have a "continuing duty to consider [the Guidelines], along with the other factors listed in [18 U.S.C. § ] 3553(a)." *United States v. Crosby*, 397 F.3d 103, 111 (2d Cir.2005) (internal quotation marks omitted). Our duty to review the district court's treatment of Guidelines section 3C1.1 thus survives *Booker*. *See United States v. Agudelo*, 414 F.3d 345, 347 (2d Cir.2005).

■ We apply a mixed standard of review to obstruction-of-justice enhancements in sentencing. *See United States v. Ayers*, 416 F.3d 131, 133 (2d Cir.2005) (per curiam). We review for clear error "[t]he sentencing court's findings as to what acts were performed, what was said, what the speaker meant by [his] words, and how a listener would reasonably interpret those words." *United States v. Cassiliano*, 137 F.3d 742, 745 (2d Cir.1998). However, "[a] ruling that the established facts constitute obstruction or attempted obstruction under the Guidelines ... is a matter of legal interpretation and is to be reviewed *de novo*, giving 'due deference to the district court's application of the guidelines to the facts.'" *Id.* (quoting 18 U.S.C. § 3742(e) (1994)) (internal citation omitted).

Guidelines section 3C1.1 provides for a two-level increase in offense level where

---

7. *United States v. Walcott*, 61 F.3d 635 (8th Cir.1995).

8. *United States v. Porter*, 145 F.3d 897 (7th Cir.1998).

9. The court's language is ambiguous as to whether Bliss *knew* that an indictment was

likely to occur. In light of its finding of specific intent to obstruct justice, that is probably the court's intended meaning. For the reasons discussed below, however, Bliss' behavior does not amount to obstruction of justice, even if he knew an indictment was likely.

(A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense.

U.S.S.G. § 3C1.1.

We held in *United States v. Stroud* that "mere flight in the immediate aftermath of a crime, without more, is insufficient to justify a section 3C1.1 obstruction of justice enhancement." 893 F.2d at 507. In that case, the defendant was pursued by police shortly after he robbed a bank. *Id.* at 505. He slipped out of his jacket, pulled loose from a police officer's grasp, and led police on a chase that ended only when defendant ran into traffic and was surrounded. *Id.* We observed that, while "Guidelines § 3C1.1 contains a clear *mens rea* requirement that limits its scope to those who 'wilfully' obstruct or attempt to obstruct the administration of justice," *id.* at 507, "Stroud's flight appears to have been a natural attempt to avoid apprehension, not a willful attempt to impede or obstruct justice within the purview of section 3C1.1," *id.* at 508.

Subsequent to our decision in *Stroud,* the Sentencing Commission amended its Application Notes to include "avoiding or fleeing from arrest"[10] in the illustrative list of behaviors that "do not warrant application of this adjustment," U.S.S.G. § 3C1.1, App. Note 5, "but that ordinarily can appropriately be sanctioned by the determination of the particular sentence within the otherwise applicable guideline range." U.S.S.G. § 3C1.1, App. Note 3.

In *Stroud* we suggested that there may be cases "where instinctual flight, due to its duration or acts occurring in the course thereof, ripens into a willful attempt to impede or obstruct the administration of justice." 893 F.2d at 508. Indeed, as the Ninth Circuit has observed, "flight, coupled with other 'obstructive' conduct, may justify the § 3C1.1 enhancement." *United States v. Madera–Gallegos,* 945 F.2d 264, 267 (9th Cir.1991). In the years following *Stroud* and the amendment of the Application Notes, it has become apparent that "[t]he distinction between merely 'avoiding or fleeing from arrest' and obstructing justice is somewhat imprecise and courts have generally relied on the facts of the particular case to determine when the enhancement is justified." *United States v. Walcott,* 61 F.3d 635, 639 (8th Cir.1995).

For example, the Eighth Circuit affirmed the application of the enhancement where, after the defendant was indicted and a warrant issued for his arrest, the defendant "changed his residence, employed the use of an additional alias, and attempted to change his appearance." *Id.* "Not insignificantly," the court noted, "when [the] authorities finally caught up with him, Walcott refused to surrender and was only removed from the house following the use of tear gas and flash bombs." *Id.* The court concluded that "[w]hile individual components of Walcott's conduct alone may not constitute obstruction of justice, when viewed cumulatively ... the totality of Walcott's conduct warranted an enhancement under section 3C1.1." *Id.*

By contrast, the Ninth Circuit reversed the application of an obstruction-of-justice enhancement where two defendants fled to

10. The comment cross-references a separate provision in the Guidelines for enhancements based on reckless endangerment during flight.

*See* U.S.S.G. § 3C1.2 (Reckless Endangerment During Flight).

Mexico after the arrest of three co-defendants, knowing that authorities were looking for them. *Madera–Gallegos,* 945 F.2d at 265–68. In that case, the Ninth Circuit observed that although the defendants were absent for nine months, "Application Note 4(d) does not restrict its application to flights of short durations. Moreover, a defendant's failure to surrender to authorities is already considered under the guidelines in the acceptance of responsibility adjustment." *Id.* at 268.

Similarly, the Sixth Circuit held that the enhancement was erroneously applied to two defendants who "undoubtedly abandoned their known residence in an attempt to avoid being arrested" after the arrest of their co-conspirator. *United States v. Sanchez,* 928 F.2d 1450, 1459 (6th Cir. 1991), *abrogated on other grounds by United States v. Jackson–Randolph,* 282 F.3d 369 (6th Cir.2002).

■ Of particular relevance to our case is the Eleventh Circuit's reversal of an obstruction-of-justice enhancement in *United States v. Alpert,* 28 F.3d 1104 (11th Cir.1994). In that case, the defendants had already begun plea negotiations with the government when they disappeared without a trace. *Id.* at 1106. When later arrested in another state for fraudulently leasing a car, one defendant provided a false name to the arresting officer. *Id.* The Eleventh Circuit concluded that "the § 3C1.1 enhancement does not apply to persons engaged in criminal activity who learn of an investigation into that activity and simply disappear to avoid arrest, without more." *Id.* at 1107.

Most significantly, the court stated that the defendants "may have engaged in *additional* conduct while avoiding arrest ... that would warrant application of the obstruction enhancement," but "the district court's findings were insufficient to permit application of the enhancement." *Id.* at 1107–08. Specifically,

> because providing a false name or identification document at arrest does not justify the enhancement except where such conduct actually resulted in a significant hindrance to the investigation or prosecution a district court applying the enhancement because a defendant gave a false name at arrest must explain how that conduct significantly hindered the prosecution or investigation of the offense.

*Id.* (internal quotation marks and citation omitted). The Court of Appeals observed that "the district court's *inference* that the [defendants'] activities slowed down the criminal process does not permit this Court to review the enhancement with a sufficient understanding of the factual circumstances underlying the district court's decision." *Id.* at 1108.

Applying these principles, we conclude that Bliss' actions, which amount to little more than "simply disappear[ing] to avoid arrest," [11] *id.* at 1107, fall short of what we believe the Sentencing Commission contemplated in prescribing the enhancement for obstruction of justice. Following the reasoning of the Ninth and Eleventh Circuits, we believe that Bliss' flight itself is insufficient to support the district court's application of the enhancement.[12] *See Ma-*

---

**11.** We agree with the district court that it is not "terribly relevant" in this case that Bliss fled before the warrant for his arrest was issued. *See, e.g., United States v. Irabor,* 894 F.2d 554, 556 (2d Cir.1990) ("Nothing in the plain language of the guideline indicates any congressional intent to limit its application to conduct occurring after the initiation of proceedings.").

**12.** We do not find it significant that Bliss made his way to California using two different cars, particularly in light of the fact that both were so easily traceable to him. We do not believe it would have helped Bliss' case

*dera–Gallegos,* 945 F.2d at 267; *Alpert,* 28 F.3d at 1107. We therefore look for other "obstructive conduct" that, "coupled with" his flight, might allow us to affirm the court's ruling. *Madera–Gallegos,* 945 F.2d at 267 (internal quotation marks omitted).

### A. *Use of an Alias*

█ In determining whether Bliss' use of an alias was "obstructive conduct," the Application Notes to the Guidelines are again instructive. Notes 5(a) and (b) indicate that neither "providing a false name or identification document *at arrest*" nor "making false statements, not under oath, *to law enforcement officers*" would ordinarily warrant application of the obstruction-of-justice enhancement unless such conduct actually hindered or impeded the investigation or prosecution of the offense. U.S.S.G. § 3C1.1, App. Notes 5(a) & (b) (emphasis added). If misrepresentations made directly to law enforcement officers in the course of the investigation cannot be the basis for an obstruction-of-justice enhancement without a showing of actual prejudice then, *a fortiori,* the use of an alias in mundane affairs ordinarily should not be deemed obstructive without such a showing.

Here, the court found that Bliss used a false name [13] while in California, but the government has made no showing—nor did the district court find—that Bliss' use of an alias "actually resulted in a significant hindrance to the investigation or prosecution of the instant offense:" U.S.S.G. § 3C1.1, App. Note 5(a). The government's evidence supporting the enhancement consisted largely of testimony as to the substantial expenditure of governmental resources in the search for Bliss and the length of time Bliss was able to avoid capture. To be sure, in many cases the fruitlessness of law enforcement efforts and the length of time in which a suspect is able to avoid apprehension reflect a "calculated and deliberate plan to evade the authorities." *United States v. Porter,* 145 F.3d 897, 904 (7th Cir.1998). In other cases, however, like this one, the failure of law enforcement authorities to apprehend a fugitive cannot fairly be attributed to the fugitive's cunning. Thus, the district court erred as a matter of law in stating that "the fact that [Bliss] was a fugitive for more than a year, or about a year, justifies the enhancement."

We do not question, as Bliss' trial coun-

---

had he driven his mother's and stepfather's car—without permission—the whole way from Vermont to California, thereby potentially adding grand theft auto to his already lengthy list of offenses.

13. It is not clear whether Bliss used one or two aliases. The government presented evidence at sentencing that at the time of his arrest Bliss "had been using a couple of different identities.... He ... was operating under two different names, one of which he used for employment, and a different one that he used to secure a cellular telephone which was on him when we ultimately arrested him." Regarding the name used in his employment the evidence was that, after providing his true name, Bliss asked his employer to pay him under a different name, "saying that

he had some kind of issues in a court proceeding back east." There was no evidence at sentencing as to what those names were. By contrast, the presentence report refers only to one alias, "Michael Clark," and provides detail as to the circumstances under which it was used.

The court apparently found that Bliss used only one alias, because it consistently used the singular article "a": the court stated that "perhaps he used his real name when he had the job, but as I understand it he used a different name thereafter," and found that Bliss "did use a false identity."

The existence of a second alias would not alter our conclusion that Bliss' use of a false identity was not obstructive conduct under the circumstances of this case.

sel did,[14] the FBI's decision to make Bliss one of its Ten Most Wanted or to feature him on the television program "America's Most Wanted." It is not our province to critique the executive branch's allocation of resources in the search for and apprehension of fugitives, for "[t]he interference of the Court with the performance of the ordinary duties of the executive departments of the government would be productive of nothing but mischief." *Decatur v. Paulding*, 39 U.S. (14 Pet.) 497, 516, 10 L.Ed. 559 (1840). As a corollary to that rule, however, we will not accept the length of a fugitive's absence as *prima facie* evidence that he obstructed justice. There must be some showing that *the defendant's obstructive conduct* resulted in the delay in his apprehension.

In this case, the government's evidence indicates that the bulk of its resources were spent pursuing false leads provided by "America's Most Wanted" viewers—not following Bliss on a wild goose chase of his own making. *Cf. United States v. Mondello*, 927 F.2d 1463, 1466–67 (9th Cir.1991) (referring to Mondello's post-arrest "cat-and-mouse" game to avoid authorities when expected to surrender). The United States Marshals' Fugitive Task Force eventually apprehended Bliss in the same city—albeit the second-largest in the nation—to which his whereabouts had been traced almost a year previously. Moreover, the presentence report contained evidence that the government did not contest: that Bliss lived in the "months before [he]

was arrested . . . 30 feet from the Rampart Division Police Station in L.A.," that two weeks before capture Bliss "spotted an FBI agent at Topenga [sic] Park by the restrooms and purposely doubled back and walked up to him," and that the last two months before his arrest Bliss visited a public library five to six times a week "walking by different LAPD officers 10–20 times a day, waiting, expecting someone to notice [him]." Nor is there evidence in the record that Bliss resisted arrest in any way once found.

In no way do we imply that local or federal law enforcement authorities were remiss in their search for Bliss; however, these uncontested facts preclude an inference that the delay in apprehending Bliss is largely attributable to obstructive conduct on Bliss' part. Therefore, the year that it took for authorities to find Bliss does not in and of itself demonstrate that Bliss' use of an alias actually prejudiced the investigation. In the absence of such a showing, we decline to consider this "obstructive conduct."[15]

### B. *Change in Appearance*

■ The government argues on appeal that we should also consider evidence that Bliss' appearance had changed between the time of his crimes and the time of his apprehension. Specifically, the government adduced evidence at sentencing that a comparison of Bliss' appearance at arrest

---

**14.** Defense counsel established at sentencing that Osama Bin Laden was then number one on the FBI's Most Wanted List and argued to the court, "this case . . . is not Osama Bin Laden."

**15.** We recognize that the Seventh Circuit has affirmed the application of the obstruction-of-justice enhancement based, in part, on a defendant's use of a false identity and without an explicit finding of actual prejudice. *See Porter*, 145 F.3d at 903–04. Without express-

ing any opinion as to that decision, we note that Bliss' use of an alias is a far cry from the elaborate creation of a false identity by the defendant in *Porter*, who not only rented a mobile home under an alias, but also "created a fabricated driver's license, social security card, and birth certificate. And he apparently accomplished all of this with the aid of a helpful book entitled 'How to Create a New Identity.' " *Id.* at 904.

with earlier images revealed that over the course of the year he was missing Bliss gained weight and grew a moustache.

However, the government did not show that such changes in weight and facial hair were abnormal for Bliss, nor that such changes were "calculated and deliberate." *Porter,* 145 F.3d at 904. The FBI agent who testified at sentencing on behalf of the government indicated that he had no knowledge about the defendant's history of gaining and losing weight or growing facial hair. Indeed, Bliss is noticeably heavier in one of the three photos featured on his FBI "WANTED" poster than in the other two, which would indicate that he did not at all times in the past maintain a lower body weight than he did in the year of his absence from Vermont.

Accordingly, the district court made no reference to any change in Bliss' appearance in its ruling on the obstruction-of-justice enhancement. We, too, decline to consider Bliss' gaining weight and growing a moustache to be obstructive tactics.

Because Bliss' flight from the jurisdiction does not constitute obstruction of justice and because he engaged in no other obstructive conduct, we hold that the district court erred in applying the two-level enhancement under Guidelines section 3C1.1. Accordingly, we vacate the sentence imposed by the district court.

█ Finally, we note that our holding is limited to the application of Guidelines section 3C1.1; we do not suggest that "such uncooperative conduct must go unpunished." *Alpert,* 28 F.3d at 1107. As the Guidelines' Application Notes indicate, on remand Bliss' flight from the jurisdiction may be punished by withholding the acceptance of responsibility credit or otherwise sanctioned within the applicable Guideline range. *See* U.S.S.G. § 3C1.1, App. Note 5.

## II. Crosby *Remand*

█ Pursuant to the United States Supreme Court's decision in *Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621, a sentencing judge must now consider the factors specified in 18 U.S.C. § 3553(a) and then decide whether to impose a Guidelines or a non-Guidelines sentence. *See Crosby,* 397 F.3d at 110–12. Because Bliss was sentenced prior to *Booker,* a remand for consideration of resentencing is appropriate. *See id.*

## III. *Denial of Motion to Appoint Substitute Counsel*

█ Bliss also contends that the district court erred in denying his motion to appoint substitute counsel without conducting a hearing. We disagree.

We have held that when a defendant "voices a seemingly substantial complaint" about his attorney, the district court should inquire into the matter. *McKee v. Harris,* 649 F.2d 927, 933 (2d Cir.1981) (internal quotation marks omitted). However, "[i]f the reasons are made known to the court, the court may rule without more." *Id.* at 934 (internal quotation marks omitted).

In this case, the motion to withdraw and appoint substitute counsel and motion to reconsider, together with a seventeen-page handwritten letter prepared by Bliss, set forth in detail Bliss' and his counsel's concerns. Having thus been apprised of Bliss' concerns, the district court did not abuse its discretion when it ruled on the motions without hearings. *See United States v. Simeonov,* 252 F.3d 238, 241–42 (2d Cir. 2001) (per curiam) (holding that the district court did not abuse its discretion in denying a motion to substitute counsel when reasons for defendant's dissatisfaction with his attorney were made known to court through a letter and orally at sentencing).

Furthermore, by granting an extension of time and relocating Bliss closer to defense counsel, the court remedied the communication problems articulated in Bliss' letter. In the end, then, there was not a "total lack of communication preventing an adequate defense." *Id.* at 241 (internal quotation marks omitted). Additionally, we note that Bliss' trial counsel raised an issue—the impropriety of a sentence enhancement for obstruction of justice—that has persuaded us and led to our vacating Bliss' sentence. "Based on these facts, we cannot say that the conflict between [Bliss] and [his attorney] prevented an adequate defense." *United States v. John Doe No. 1,* 272 F.3d 116, 124 (2d Cir.2001).

Accordingly, we hold that the district court did not abuse its discretion in denying Bliss' motion to appoint substitute counsel and affirm the judgment of conviction.

## CONCLUSION

For the above reasons, we affirm in part, vacate the judgment as to the sentence and remand for further proceedings consistent with this opinion.[16]

---

**16.** Any appeal taken from the district court following this remand and resentencing can be initiated only by filing a new notice of appeal. *See* Fed.R.App.P. 3, 4(b).